Opinion
 

 ARDAIZ, P. J.
 

 Apellant Carol Butcher was an overnight guest at the home of Donald and Peggy Gay in Pine Mountain on August 4, 1990. On February 20, 1991, appellant filed this action against respondent Donald Gay. She alleged that she had contracted Lyme disease “as a result of exposure to infested ticks” on respondent’s property, and that respondent had “failed to spray the area, post signs or prevented [szc] domestic dog(s) from coming into contact with the plaintiff thereby exposing her to a vector of the disease without her knowledge.” Her third amended complaint presented two causes of action, one entitled “premises liability” and one entitled “general negligence.” Both causes of action alleged in essence that respondent had negligently permitted his dog to become infested with a Lyme-disease-carrying “western black legged tick,” had negligently failed to warn appellant to avoid exposure to the dog, and had negligently allowed the dog to sit on appellant’s lap. Respondent’s answer, filed in January 1992, denied the allegations of appellant’s third amended complaint.
 

 
 *393
 
 Respondent moved for summary judgment. He contended that certain undisputed facts demonstrated that he “owed no duty to protect or defend plaintiff from the alleged harmful insect” and that he was not the cause of any injury to appellant. The superior court granted the motion and ruled that “defendant was under no duty to prevent the injury plaintiff alleges occurred.”
 

 Facts
 

 Respondent presented the following evidence in support of his motion.
 

 Peggy Gay’s declaration asserted that she had owned a pet dog named Pansy since 1988.
 
 [1]
 
 Since 1989 Peggy, respondent and Pansy had lived at 1701 Zermatt Drive in Pine Mountain Club. During this time she had never seen a western black-legged tick, and had never been told by any person that the western black-legged tick was prevalent in or indigenous to the Pine Mountain area. She became acquainted with appellant sometime in 1990, and appellant was invited to stay as a guest in the Gay home during a local community festival. Appellant arrived in Pine Mountain on the afternoon of August 4, 1990, and left the Gay home in the late morning on August 5, 1990. At no time during appellant’s visit to the Gay home did appellant say that she had seen a western black-legged tick or any other insect. Nor did appellant indicate that she had been bitten by any tick or insect, or complain of any rash or “skin irritant.” At no time prior to appellant’s visit had anyone ever told Peggy that anyone had been bitten by a western black-legged tick in the Pine Mountain area. Nor had any guests to her home complained of seeing any fleas or western black-legged ticks on the Gay property, or of having been bitten by any such tick. She had not seen or heard any announcement about the presence of Lyme disease in California, and had received no information that the western black-legged tick was a carrier of the disease.
 

 Peggy kept Pansy “well groomed and clean.” She occasionally inspected Pansy for fleas and ticks, and used flea and tick shampoos “on a monthly basis to repel these insects” but had never seen any evidence of a tick or flea actually having been present on Pansy. Pansy’s veterinarian was Dr. Diane Cosko. Dr. Cosko had never told Peggy that Dr. Cosko had ever found fleas or ticks on Pansy.
 

 Respondent’s declaration was virtually identical to Peggy’s. It included the same denials of any knowledge that western black-legged ticks carried
 
 *394
 
 Lyme disease or that these ticks were prevalent in the Pine Mountain area. Respondent added that he had become acquainted with appellant during a visit to his son’s home earlier in 1990, and that it was respondent who had invited appellant to stay as a guest at the Gay home during a local community festival.
 

 The declaration of Dr. Cosko (Pansy’s veterinarian) stated that she had “had occasion” to examine Pansy and that during her examination she had never found Pansy to possess a tick or any portion of a tick. Nor did she see any sign that Pansy had been bitten by a tick. Nor did Pansy exhibit any symptoms of Lyme disease. She had never found Pansy’s fur to be dirty or matted. Dr. Cosko also stated that in her capacity as a veterinarian in the Frazier Park area, she was “responsible for posting information in my office regarding pests that may cause serious illness to pets or their owners.” She was never informed at any time prior to August 15, 1990, that any tick in Kern County had tested positive for the Lyme disease bacteria. At no time prior to August 4 had she received any warning notices from the California State Department of Health or the local mosquito abatement district regarding the presence of Lyme disease in the Frazier Park or Pine Mountain area. Prior to August 15, 1990, she had not posted in her office any pamphlets or reading paraphernalia regarding Lyme disease. A vaccine for Lyme disease was made available sometime after August 15, 1990. The vaccine was distributed by the Fort Dodge Chemical Company and “was intended to be used on the local canine population.” The vaccine “was accompanied by information regarding Lyme disease to be disseminated to the general public.” “After August 1990” Dr. Cosko was “called upon to review literature regarding the spread of Lyme disease and to present lectures to various community groups, in the Frazier Park area” regarding the spread of Lyme disease.
 

 Joan Peet owned Joan’s Canine Corner, a pet grooming business. Prior to opening her business, she attended canine grooming classes for a six-month period. Some of these classes related to the detection and identification of certain pests that may be on a pet when the pet is presented for grooming. She was trained in the inspection for and detection of the presence of ticks or fleas, and in the detection of evidence that would indicate such pests had recently been present on a dog. Between June 1988 and August 1992, Peggy brought Pansy to Joan’s Canine Corner “for regularly scheduled grooming.” During the summer of 1990, Pansy’s regularly scheduled grooming took place on June 27, 1990, and on August 9, 1990. At each appointment Peet inspected Pansy to determine if any fleas or ticks were present. Peet never saw any fleas or ticks on Pansy and “never saw . . . any evidence that such pests had been present.” At no time during Pansy’s visits did Peet find Pansy’s coat to be matted or in disrepair.
 

 
 *395
 
 The declaration of Dan Bird, M.D., offered the opinion that appellant was not suffering from Lyme disease. He reached this opinion after reviewing the medical records of several doctors who had treated appellant.
 

 Respondent also presented portions of appellant’s deposition testimony. Appellant testified that she had no information the Gays knew the dog had ticks on it. She also stated that she never actually saw any insect or bug on her own body while she was at the Gay home. All she saw was something that looked like an insect bite.
 

 Appellant opposed the motion by attempting to demonstrate that she had contracted Lyme disease from a tick carried by Pansy, and that respondent should have taken steps to mitigate the possibility of such an occurrence. She presented the declarations of herself, Dr. Wilfred Ellis, and attorneys Jack M. Janis and Michael P. Dacquisto. She also presented respondent’s responses to appellant’s request for admissions.
 

 Respondent admitted in requests for admissions that he had “permitted the dog to jump onto the lap of plaintiff at her request.” He also admitted that the dog was not wearing a flea and tick collar on August 4,1990, or during the six months prior to that date, that he permitted the dog to freely roam the wooded area adjacent to the Gay property, and that the dog was unlicensed. Respondent also admitted that “dog owners have a reasonable responsibility to protect members of the public from diseases, of the nature that are prevented through vaccinations and regular shots of pets.”
 

 The declaration of Wilfred Ellis, M.D., stated that Dr. Ellis was a medical doctor specializing in the area of infectious diseases, that he had examined appellant and that he was of the opinion that appellant was suffering from “Stage III Lyme disease.”
 

 The declaration of appellant’s attorney, Jack M. Janis, stated that in late 1990 he went to the City of Los Angeles Department of Animal Regulation in Northridge, California to purchase a license for his dog. While paying for the license, he noticed a document on the wall which discussed Lyme disease in California and the location of the tick that spreads it. He spoke with an animal control officer about the document. He “learned that the document was an official publication of the State of California, Department of Health Services, Vector Surveillance and Control Branch.” Janis asked the officer for a copy of the document and the officer complied. Janis attached a copy of the document to his declaration. The document is entitled “Facts about Lyme Disease in California.” The document describes Lyme disease as follows:
 

 
 *396
 
 “Lyme disease is an infectious disease transmitted by the bite of a tick. It is caused by a spirochate (a spiral-shaped bacterium) that may persist in the human body for several years if not properly treated with antibiotics. The natural history of this disease is not completely understood and the illness it produces takes many forms. Because of varied symptoms, diagnosis can be difficult. This newly recognized disease was first noted in 1975 at Old Lyme, Connecticut, and was first seen in California in 1978.
 

 “Lyme disease is now recognized as an important tick-borne disease throughout the northeastern USA from Massachusetts to Delaware; in the midwest in Minnesota and Wisconsin; in some southeastern states; and in the west in California, Oregon, and Nevada, as well as in many European countries.”
 

 The document (also referred to by appellant as a “leaflet”) describes the manner of transmission of Lyme disease as follows:
 

 “The Western Black-legged Tick (Ixodus pacificus) is the only tick of the 49 species occurring in California that is known to transmit Lyme disease. The spirochete causing Lyme disease was first isolated from this tick in 1984.
 

 “The tick has three active life stages: Immature stages (larvae and nymphs) feed on small rodents, rabbits, lizards, birds, and occasionally large mammals. Adults feed on large mammals, including deer, dogs, and humans. All stages feed by imbedding their mouth-parts into the skin of a host and taking a blood meal.
 

 “Preliminary studies show that white-footed mice and deer may be the primary reservoirs of Lyme disease in California. Larval and nymphal ticks acquire spirochetes from the blood of infected mammals as they feed; the infected nymphs and adults transmit the spirochetes to other mammals (including humans). In California a low percentage of the ticks tested are infected with the Lyme disease spirochete.
 

 “Adult ticks are most commonly found from December through June, during the period of the year when humidity is usually high. The adult female is red-brown with black legs, about 1/8 of an inch long; males are smaller and entirely brownish-black. Both are teardrop shaped. While the Western Black-legged Tick has been reported from 50 of the 58 California counties, it is most common in the humid coastal areas and on the western slope of the Sierra Nevada range.
 

 “This tick can be found on grasses and brush in both urban and rural settings. Ticks do not fly, jump, or drop from trees. Instead they climb to the
 
 *397
 
 tips of vegetation, typically along animal trails or paths, and wait for a host to brush against them. This behavioral method of finding a host is called questing.”
 

 Under a heading entitled “Symptoms,” the leaflet states in part that “[t]he first recognizable symptom usually is a characteristic rash . . . that occurs 3 to 30 days after the bite of an infected tick.” The rash “is a red, blotchy, circular, expanding rash that may grow to several inches in diameter and clears centrally, producing a ring-like appearance.” Under the heading “Tick Avoidance” the leaflet gives eight recommendations for avoiding contracting the disease. These are:
 

 “Personal
 

 “Tuck pants into boots or socks, and shirt into pants.
 

 “Wear light-colored clothing so ticks can easily be seen.
 

 “Apply insect repellent on pants, socks, and shoes. Use a repellent registered for use against ticks.
 

 “Avoid trail margins, brush, and grassy areas when in tick country.
 

 “Check yourself and your children frequently.
 

 “Environmental
 

 “Mow grass along trails, buildings, and camping areas.
 

 “Remove brush along trails or other areas of high human activity.
 

 “Area application of insecticides is
 
 not
 
 effective for tick control.”
 

 The leaflet includes a map of California showing the “Distribution of the Western Black-legged Tick” in the state. The areas of the state where the tick has been found are designated by a dark shading. A fairly large, almost oval-shaped area of central California is not shaded on the map, but it does not appear that the reader of the pamphlet can tell with any degree of certainty whether the Pine Mountain area is or is not an area where the tick has been found. The lower left hand comer of a page of the leaflet bears the notation “4/86.”
 

 Appellant’s declaration attempted to dispute respondent’s contention that appellant did not suffer from Lyme disease. She stated that Dr. Bird never examined her. Attached to her declaration was a document which she said
 
 *398
 
 was prepared by a Dr. Ling and which states, among other things, “You have clinical Lyme disease.” Her declaration also stated:
 

 “7. After I learned I had Lyme disease, I did extensive reading on it. As a result of that reading, I learned that ticks were the insects that carried this disease, the ticks that carry it are very small and not visible to the naked eye, and that these ticks are generally found in wooded areas and often times on dogs.
 

 “8. At no time while I was in Frazier Park, at Mr. Gay’s house, did I come in contact with any dogs or other animals that carry ticks, other than Mr. Gay’s dog, Pansy. I first noticed a red spot on my leg, below my knee, that looked like a bite, and extensive itching while I was at Mr. Gay’s house.
 

 “9. At no time did Mr. Gay ever tell me to wear long clothes, to use insect spray, to stay away from his dog, or to be on the lookout for ticks that might bite me. If he had done this, I would have taken these precautions.
 

 “10. While I was at Mr. Gay’s house the dog appeared dirty and unkept. It did not look like it had been recently groomed.
 

 “11. Mr. Gay’s house in Frazier Park is in an area that is somewhat mountainous and wooded.”
 

 The declaration of appellant’s other attorney, Michael P. Dacquisto, described the procedural history of this case prior to respondent’s motion for summary judgment. These procedural facts are pertinent only to appellant’s contention that the court should have continued the hearing on respondent’s summary judgment motion to allow appellant to conduct further discovery. We will set forth the pertinent procedural facts in our discussion of that particular issue.
 

 Contentions on Appeal
 

 Appellant contends (1) respondent did not establish the absence of a legal duty to appellant, (2) respondent did not establish the absence of a triable issue as to causation, and (3) the trial court should have continued the hearing on the motion so appellant could conduct further discovery.
 

 Discussion
 

 In order for a plaintiff to succeed in a negligence action brought against a defendant, the plaintiff must demonstrate (1) the existence of a
 
 *399
 
 duty of due care owed by the defendant to the plaintiff, (2) defendant’s breach of that duty, and (3) injury or damage to the plaintiff that is (4) legally caused by the defendant’s breach.
 
 {Peter W.
 
 v.
 
 San Francisco Unified Sch. Dist.
 
 (1976) 60 Cal.App.3d 814, 820 [131 Cal.Rtpr. 854]; 6 Witkin Summary of Cal. Law (9th ed. 1988) Torts, § 732; 4 Witkin Cal. Procedure (3d ed. 1985) Pleading, § 527.) In the present case, respondent attempted to demonstrate that he owed no duty to appellant to take steps to prevent her from being bitten by a Lyme-disease-carrying tick. A motion for summary judgment “shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” (Code Civ. Proc., § 437c, subd. (c); see also
 
 Mann
 
 v.
 
 Cracchiolo
 
 (1985) 38 Cal.3d 18, 35 [210 Cal.Rtpr. 762, 694 P.2d 1134];
 
 Lipson
 
 v.
 
 Superior Court
 
 (1982) 31 Cal.3d 362, 374 [182 Cal.Rtpr. 629, 644 P.2d 822].) When respondent’s motion for summary judgment was heard and decided in 1993, subdivision (n) of Code of Civil Procedure section 437c stated in relevant part:
 

 “(n) For purposes of motions for summary judgment and summary adjudication:
 

 “(2) A defendant or cross-defendant has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Once the defendant or cross-defendant has met that burden, the burden shifts to the plaintiff or cross-complainant to show that a triable issue of one or more material facts exists as to that cause of action.”
 
 [2]
 

 An appellate court reviewing a trial court’s granting of summary judgment will make a de novo determination of whether there is a triable issue of fact and whether the moving party is entitled to judgment as a matter of law.
 
 {Saldana
 
 v.
 
 Globe-Weis Systems Co.
 
 (1991) 233 Cal.App.3d 1505, 15111515 [285 Cal.Rtpr. 385.)
 
 [3]
 
 The moving party’s papers are strictly construed, while those of the party opposing the motion are liberally construed. If there
 
 *400
 
 is any doubt as to whether summary judgment should be granted, that doubt should be resolved in favor of the party opposing the motion.
 
 (Brooks
 
 v.
 
 Eugene Burger Management Corp.
 
 (1989) 215 Cal.App.3d 1611, 1618 [264 Cal.Rtpr. 756].)
 

 I.
 

 Duty
 

 In a negligence case the existence and scope of a defendant’s duty is a legal question to be decided by the court. It is not a factual question to be decided by the trier of fact. The California Supreme Court made this clear in
 
 Ballard
 
 v.
 
 Uribe
 
 (1986) 41 Cal.3d 564 [224 Cal.Rtpr. 664, 715 P.2d 624], where the court stated in footnote 6 at pages 572-573: “The question of ‘duty’ is decided by the court, not the jury. [Citations.] As this court has explained, ‘duty’ is not an immutable fact of nature ‘ “but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.” ’ [Citations.] In California, the general rule is that all persons have a duty ‘ “to use ordinary care to prevent others being injured as the result of their conduct. . . .” ’
 
 (Rowland
 
 v.
 
 Christian
 
 (1968) 69 Cal.2d 108, 112 . . . .)
 
 Rowland
 
 enumerates a number of considerations, however, that have been taken into account by courts in various contexts to determine whether a departure from the general rule is appropriate: ‘the major [considerations] are
 
 the forseeability of harm to the plaintiff,
 
 the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant’s conduct and the injury suffered, the moral blame attached to the defendant’s conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.’ (Italics added.) [Citation.]”
 

 The court reaffirmed in
 
 Ann M.
 
 v.
 
 Pacific Plaza Shopping Center
 
 (1993) 6 Cal.4th 666 [25 Cal.Rptr.2d 137, 863 P.2d 207], that “the existence of a duty is a question of law for the court” and an appellate court will “determine de novo the existence and scope of the duty . . . .”
 
 (Id.
 
 at p. 674.)
 
 Ann M.
 
 also clarified that although foreseeability of harm to the plaintiff is one of the seven considerations
 
 [4]
 
 listed in
 
 Ballard
 
 and in
 
 Rowland
 
 as matters to be taken into account by a court in determining the existence and scope of a duty, this does not mean a plaintiff is necessarily entitled to have the trier of fact determine whether the plaintiffs injury was a foreseeable result of the
 
 *401
 
 defendant’s conduct. “Foreseeability, when analyzed to determine the existence or scope of a duty, is a question of law to be decided by the court.”
 
 (Ann M.
 
 v.
 
 Pacific Plaza Shopping Center, supra,
 
 6 Cal.4th at p. 678.)
 

 In
 
 Brunelle
 
 v.
 
 Signore
 
 (1989) 215 Cal.App.3d 122 [263 Cal.Rtpr. 415], the plaintiff spent a weekend at the defendant’s vacation home in Cathedral City and was bitten by a “brown recluse spider.”
 
 (Id.
 
 at p. 125.) The spider’s venom destroyed tissue in the plaintiffs right foot. The foot became swollen and infected and developed ulcerated lesions. The plaintiff’s complaint alleged the defendant negligently maintained his property and “failed to warn plaintiff regarding the property’s safe use . . . .”
 
 (Id.
 
 at p. 125.) The defendant moved for summary judgment and contended although he had a duty to use ordinary care to prevent others from being injured as a result of his conduct, that duty did not, as a matter of law, require him to take affirmative steps to protect against or to warn about the possibility of being bitten by a spider. The Court of Appeal affirmed the trial court’s grant of summary judgment and stated: “Our consideration of the
 
 Rowland
 
 factors leads us to the conclusion in this case that an owner or occupier of a private residence does not have a duty to protect or prevent bites from harmful insects where: (1) it is not generally known that the specific insect is indigenous to the area; (2) the homeowner has no knowledge that a specific harmful insect is prevalent in the area where his residence is located; (3) the homeowner has on no occasion seen the specific type of harmful insect either outside or inside his home; and (4) neither the homeowner nor the injured guest has seen the specific insect that bit the guest either before or after the bite occurred. To impose a duty under these circumstances, where the owner or occupier of the premises had no reason to anticipate or guard against such an occurrence would be unfair and against public policy. Imposition of a duty even in those cases where the homeowner shared general knowledge with the public at large that a specific harmful insect was prevalent in the area but the homeowner had not seen the specific harmful insect either outside or inside his home would impose a duty on the owner or occupier of the premises that would also be unfair and against public policy. In either of these instances, the burden on the landowner would be enormous and would border on establishing an absolute liability. Further, the task of defining the duty and the measures required of the owner or occupier of private residences to meet that duty would be difficult in the extreme.”
 
 (Brunelle
 
 v.
 
 Signore, supra,
 
 215 Cal.App.3d at pp. 129-130, fns. omitted.)
 

 Respondent’s motion contended the evidence presented by respondent (summarized above) demonstrated the existence of seven “undisputed facts” (see Code Civ. Proc., § 437, subd. (b)) which entitled respondent to judgment in his favor as a matter of law. These “facts” were: (1) it is not
 
 *402
 
 generally known that western black-legged ticks are indigenous to the Pine Mountain Club area; (2) defendant had no knowledge that western black-legged ticks possessing the Lyme disease bacteria were prevalent in the Pine Mountain Club area; (3) Donald Gay had, on no occasion, “seen a Western Black-legged Tick infested with the Lyme disease bacteria” either outside or inside his home; (4) neither Donald Gay nor appellant saw the specific insect that bit her either before or after the bite occurred; (5) Donald Gay’s dog, Pansy, has not been a host to any flea or tick since 1988; (6) “Expert evidence exists that prove [sic], to a medical certainty, that plaintiff does not have Lyme disease;” and (7) “The actions of defendant Donald Gay are not the cause of plaintiff’s alleged injuries of
 
 [sic]
 
 a result of her alleged infection with the Lyme disease bacteria.” The last two of these seven purportedly “undisputed” facts appear to pertain to respondent’s lack of causation argument, i.e., respondent’s argument that respondent was not the cause of appellant’s alleged Lyme disease because appellant does not actually have Lyme disease.
 
 [5]
 
 The superior court rejected this contention and so do we. The declaration of respondent’s expert, Dr. Bird, was in conflict with that of appellant’s expert, Dr. Ellis, on the issue of whether appellant actually suffered from Lyme disease. The remaining five “undisputed facts” appear to be designed to attempt to demonstrate respondent cannot be held liable to appellant under the test set forth in
 
 Brunette, supra.
 

 [6]
 

 Although we find
 
 Brunette
 
 to be instructive, the four-part test set forth in that opinion does not appear to us to be appropriate for application to the present case.
 
 Brunette
 
 deals with “bites from harmful insects.” (215 Cal.App.3d at p. 129.)
 
 [7]
 
 The creature involved in
 
 Brunette,
 
 a brown recluse spider, was described as a “tan to brown” spider “approximately the size of
 
 *403
 
 a half dollar.” (215 Cal.App.3d at p. 125, fn. 1.) It could be “easily identified by a violin- or fiddle-shaped marking on its back.”
 
 (Ibid.)
 
 Presumably all or most brown recluse spiders possess the same kind of venom which caused the injuries to the plaintiff in
 
 Brunelle.
 
 Presumably all or most people would, upon seeing such a spider, either recognize it as a creature which could cause harm or pain to a human being or at least suspect it to be a potential cause of harm or pain. In the present case, however, appellant’s own evidence described the adult female western black-legged tick as being about an eighth of an inch long and the males as “smaller.” Although there was no evidence that appellant herself had actually ever seen such a tick or was herself an expert, she stated in her declaration that such a tick is “very small and not visible to the naked eye.” If a person were to see a western black-legged tick, one wonders how discernible it would be from a tick belonging to one of the other 48 species of ticks which, according to the leaflet presented by appellant, are known to exist in the state of California. Dr. Bird’s declaration states in addition that “[i]n California, only about one to two percent of the adult Western Black-legged Ticks are infected with the bacteria that causes Lyme disease.” We therefore cannot say, based upon the evidence presented to us, that someone who sees a small tick is seeing a creature that necessarily can transmit Lyme disease and is therefore “harmful” in that respect. Apparently only an extremely small percentage of all California ticks carry Lyme disease.
 

 Even if we were to conclude that a homeowner (or dog owner) could, under some circumstances, be held liable in negligence for a guest’s illness due to the transmission of a disease-carrying tick from the owner’s dog (or from another source on the owner’s property) to the guest, our consideration of the
 
 Rowland
 
 factors would nevertheless not lead us to impose liability without some degree of “moral blame attached to the defendant’s conduct.”
 
 (Rowland
 
 v.
 
 Christian
 
 (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 946];
 
 Ballard
 
 v.
 
 Uribe, supra,
 
 41 Cal.3d at p. 572.) In other words, without evidence that a defendant knew or reasonably should have known there was any danger or potential danger associated with that defendant’s act or failure to act, any imposition of liability would in essence be the imposition of liability without fault.
 
 [8]
 

 A duty does not generally arise in the context of negligence unless there is some awareness of a danger and some responsibility for it. Insects are a part
 
 *404
 
 of life’s burdens and it is reasonable to conclude a person cannot be held responsible for their existence. Where one has not fostered an environment designed to cultivate such predators they are simply part of the inherent risks of living. However, where one was aware, or reasonably should have been aware, that an animal he or she was responsible for created a risk of harm as a result of infestation by a dangerous insect, then arguably, failure to act might result in liability for harm. Realistically, the
 
 Brunette
 
 criteria require a significant degree of knowledge of the existence and locus of the insect. It is the distinction between general knowledge that black widow, spiders are frequently found in wood storage areas and specific knowledge that a black widow is in a wood storage area.
 

 In the present case, respondent presented his own declaration stating that he was unaware, prior to the alleged incident involving appellant, of the presence of Lyme disease or of ticks carrying the disease in the Pine Mountain area. No one had ever told him of anyone being bitten by such a tick in the Pine Mountain area. He declared he had “not received through any medium any indication that the Western black-legged tick was a carrier of Lyme disease in California or that said ticks were prevalent in the Pine Mountain area.” Respondent’s wife submitted a virtually identical declaration. The local veterinarian, Dr. Diane Cosko, declared that “prior to August 15, 1990, I was not informed that any tick in Kern County had tested positive for the Lyme disease bacteria.” This is evidence showing that (1) respondent was personally unaware of any Lyme disease risk and (2) it was not generally known that there was any risk of Lyme disease in the Pine Mountain area. Faced with this showing, appellant could not avoid a summary judgment against her without presenting, at a minimum, some evidence tending to show respondent knew or reasonably should have known he was subjecting appellant to a risk of incurring Lyme disease when he permitted appellant to enter his house and/or permitted Pansy to sit on appellant’s lap.
 

 Appellant argues there is a triable issue of fact as to whether respondent’s asserted ignorance of any danger of Lyme-disease-carrying ticks is truthful. She argues that the court should not have accepted respondent’s assertions about his own state of mind. Although the court could have refused to accept respondent’s assertion about respondent’s own state of mind, it was not required to do so. Subdivision (e) of the summary judgment statute provides that “summary judgment may be denied in the discretion of the court. . . where a material fact is an individual’s state of mind, or lack thereof, and that fact is sought to be established solely by the individual’s
 
 *405
 
 affirmation thereof.” The court therefore did not err in refusing to deny the motion on this basis.
 

 Appellant similarly contends the court should not have believed Dr. Cosko’s declaration that she was unaware of the presence of Lyme-disease-carrying ticks in Kern County prior to August 15,1990. This contention fails for the same reason. Under subdivision (e) the trial judge had no obligation to refuse to believe Dr. Cosko.
 

 Appellant then contends there is a triable issue of fact as to whether the presence of Lyme-disease-carrying ticks in the Pine Mountain area was generally known on August 4,1990, because appellant’s attorney, Janis, saw the above described “Facts About Lyme Disease in California” leaflet in “late 1990” in the “City of Los Angeles Department of Animal Regulation in Northridge, California.” But knowledge of persons in the City and County of Los Angeles in late 1990 is not in issue in this case. In issue is whether there was any general knowledge of the presence of Lyme-disease-carrying ticks in the Pine Mountain area of Kern County on or before August 4,1990, and, if not, whether respondent himself nevertheless had any such knowledge. Even construing the Janis declaration liberally, it does not tell us anything about information available in the pertinent place at the pertinent time. Appellant presented no evidence that this leaflet was distributed to anyone in the Pine Mountain area, or indeed anywhere in Kern County, at any time prior to August 4, 1990.
 

 Appellant further argues that even if respondent, as a property owner, had no duty to warn appellant about or protect appellant from Lyme-disease-carrying ticks, he nevertheless had this duty because he was a dog owner. We are not persuaded. Appellant points out that a dog owner has a duty to exercise reasonable care in the management of the dog. (See
 
 Drake
 
 v.
 
 Dean
 
 (1993) 15 Cal.App.4th 915 [19 Cal.Rptr.2d 325]; and Rest.2d Torts, § 518.) We do not question this proposition. But the issue here is whether that duty extends so far as to include warning a house guest not to allow a dog on her lap, or to require the taking of other steps to prevent the possible transmission of a Lyme-disease-carrying tick from the dog to the guest, if the owner does not have, and could not reasonably be expected to have, any knowledge that his dog posed any such danger to the guest. Appellant calls our attention to cases involving dog attacks and “spooked” horses. We do not find these to be apposite because it is generally known dogs sometimes bite people and that horses, when frightened, will sometimes behave in a manner that may injure people nearby. Every dog who bites people has to have a first victim. Thus, the fact that the first victim of a particular dog cannot demonstrate the dog had previously bitten someone else does not
 
 *406
 
 necessarily mean the owner of the dog was unaware of the possibility the dog might one day bite someone. The Legislature undoubtedly had this in mind when it enacted Civil Code section 3342, providing that “[t]he owner of any dog is liable for the damages suffered by any person who is bitten by the dog while in a public place or lawfully in a private place . . . regardless of the former viciousness of the dog or the owner’s knowledge of such viciousness.” If there was some evidence tending to show that a reasonably prudent dog owner in the Pine Mountain area would have been aware, prior to August 4, 1990, of a reasonable possibility that there were Lyme-disease-carrying ticks in the area, appellant should have presented that evidence.
 

 II.
 
 *
 

 Continuance
 

 III.
 

 Disposition
 

 The judgment is affirmed. Costs to respondents.
 

 Stone (W. A.), J„ and Dibiaso, J., concurred.
 

 [1]
 

 Respondent Donald Gay admitted, in a response to appellant’s request for admissions, that he too was an owner of the dog.
 

 [2]
 

 The quoted language presently appears in subdivision (o) of the statute, with the words “or a defense thereto” added to the end of the second sentence.
 

 [3]
 

 As we shall discuss,
 
 post,
 
 in part I of this opinion, subdivision (e) of the summary judgment statute expressly confers upon the judge hearing the motion the discretion to credit or not to credit the declaration of an individual about the individual’s own state of mind when his state of mind “is sought to be established solely by the individual’s affirmation thereof.” Because discretion is expressly conferred on the judge, we would review the judge’s crediting of such a declaration under an abuse of discretion standard, and would not make our own de novo determination as to whether the individual’s declaration should be credited.
 

 [4]
 

 We will hereinafter refer to these seven considerations as the
 
 “Rowland
 
 considerations” or the
 
 “Rowland
 
 factors.”
 

 [5]
 

 It would have been better practice for respondent’s motion to have contained some express indication of which of his seven “undisputed material facts” pertained to his “no causation” argument and which of those seven “undisputed material facts” pertained to his “no duty” argument. Although the summary judgment statute does not expressly require the making of such an indication when a motion for summary judgment is brought on more than one ground, “[s]ummary judgment is . . . not a trap for an unwary opponent”
 
 (Homestead Savings
 
 v.
 
 Superior Court
 
 (1986) 179 Cal.App.3d 494, 498 [224 Cal.Rtpr. 554]), or a game of blind-man’s bluff.
 

 [6]
 

 Appellant’s response to respondent’s “statement of undisputed facts” stated that appellant denied all seven “facts.” None of the evidence presented by appellant (summarized above), however, appears to contradict respondent’s evidentiary showing that he had no knowledge of the presence of Lyme disease carrying ticks in the Pine Mountain area, and that even Dr. Cosko, a veterinarian, had not been aware prior to August 15, 1990, that any tick in Kern County had tested positive for the Lyme disease bacteria. We do confess to be somewhat baffled by respondent’s “material fact” No. 3. Respondent’s own expert stated that only 1 to 2 percent of the western black-legged ticks were infected with the Lyme disease bacteria.
 

 [7]
 

 The parties appear to assume that a tick is an “insect.” We express no view on whether that assumption is scientifically accurate. One of the definitions of “insect” found in Webster’s New World Dictionary of the American Language (2d college ed. 1982), at page 728 is:
 
 *403
 
 “popularly, any of a group of small animals, usually wingless, including spiders, centipedes, wood lice, ticks, mites, etc.”
 

 [8]
 

 We note that in
 
 Brunelle, supra,
 
 the homeowner “was aware of black widow spiders and scorpions being prevalent around his house, in his garage and in his backyard constantly.” (215 Cal.App.3d at p. 132.) In
 
 Ann M., supra,
 
 6 Cal.4th 666, the landowner was presumably aware that crime sometimes occurs in San Diego. And yet the
 
 Brunelle
 
 homeowner’s duty did not require warning his guest about spiders. The
 
 Ann M.
 
 shopping center owner’s duty did not require the providing of a security guard to guard against the possibility of a shopping center
 
 *404
 
 employee being assaulted by a criminal. The evidence in the present case appears to present an even less compelling argument for the imposition of a duty than the evidence in
 
 Brunelle
 
 and
 
 Ann M.
 

 *
 

 See footnote,
 
 ante,
 
 page 388.