[No. B119304. Second Dist., Div. Two. Mar. 29, 1999.]

WESTOIL TERMINALS CO., Plaintiff and Appellant, v.
HARBOR INSURANCE COMPANY et al., Defendants and Respondents.

636

COUNSEL

Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, Terry D. Avchen, Peter C. Sheridan and Robert J. Muller for Plaintiff and Appellant.

Gordon & Polscer, Leo L. Clarke, Russell Pike and Gary A. Sparling for Defendants and Respondents.

## OPINION

**MALLANO, J.**[*]—Appellant and plaintiff, Westoil Terminals Co., a California limited partnership (Westoil Partnership), brought suit against respondents and defendants, Continental Insurance Company (Continental) and Harbor Insurance Company (Harbor) for breach of a written contract, tortious breach of the implied covenant of good faith and fair dealing, and for

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

declaratory relief.[1] In issue are two insurance policies, one issued by Harbor in effect from July 1, 1970, through October 1, 1973, the liability for which Continental has assumed, and the other issued by Continental in effect from September 1, 1973, to October 1, 1974 (the policies). The trial court granted Continental's and Harbor's motion for summary judgment, determining that the policies afforded Westoil Partnership no coverage. Westoil Partnership appeals the ensuing judgment. We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts are not in dispute. The policies issued by Continental and Harbor insured Time Oil Co. (Time Oil) and all its allied, affiliated and subsidiary companies. For the purposes of this appeal, respondents concede that Westoil Corporation was affiliated with Time Oil and, accordingly, covered by the policies. Time Oil was founded in 1942 by C. Edward Miller, Sr. Westoil Terminals Co. (Westoil Corporation) was incorporated in California in 1950. From their establishment, C. Edward Miller, Sr., held controlling interest in these businesses until 1974 when he turned the reins over to his son, C. Edward Miller, Jr. (Miller). In 1986, all of the shareholders of Westoil Corporation were members of Miller's family, except for Expert Property Management, Inc., of which Miller was the president. In that year, the individual shareholders traded their shares for a limited partnership interest in Westoil Partnership. Expert Property Management, Inc., traded its stock for the sole general partnership of Westoil Partnership. Except for real property described as "the Wilshire Office Building," all of the assets of the corporation were transferred to the new limited partnership. In the agreement memorializing the transaction, the corporation "assign[ed]" "[a]ll causes of action and choses in action; and . . . [a]ny and all other property of any kind or nature, tangible or intangible, wherever located, known or unknown" to the limited partnership. There was no specific reference to insurance policies. In return, the limited partnership assumed all liabilities of the corporation without limitation. Apart from the assumption of liabilities, there was no further consideration paid to the corporation. It was duly dissolved in 1986. Except for the Wilshire office building, Westoil Partnership carried on the same business operations as Westoil Corporation had previously maintained without any increase, under the identical name, Westoil Terminals Co.

Westoil Corporation operated a terminal facility in San Pedro, California for the storage and transfer of petrochemicals (the terminal) commencing in 1950. In 1974, it leased the terminal to Coastal States Marketing, Inc., which, in turn, assigned the lease to Western Fuel Oil Co. (Western Fuel). In

---

[1]Underwriters at Lloyd's, London, a foreign corporation, is also a defendant, but is not involved in this appeal.

1995, Western Fuel brought suit against Westoil Partnership in federal court claiming that the latter had negligently polluted the terminal and adjacent lands. The following year, Western Fuel filed a cross-complaint against Westoil Partnership in state court on a similar claim. In January of 1996, Westoil Partnership tendered the defense of the suits to Continental and Harbor under the policies. In January of 1997, Continental and Harbor agreed to defend, but with a reservation of rights, stating, in pertinent part: "It appears that Westoil may not be a named insured under the alleged Time Oil policies" and ". . . nothing in this letter is intended as a waiver of [sic] relinquishment of any rights available to us under the . . . policies."

Westoil Partnership filed the instant matter against Continental and Harbor on November 5, 1996, for breach of written contract, tortious breach of implied covenant of good faith and fair dealing, and declaratory relief. On April 10, 1997, Westoil Partnership and Westoil Corporation filed a proposed first amended complaint adding Westoil Corporation as a plaintiff. Continental and Harbor opposed, contending that Westoil Corporation was not an insured under the policies (a position they now concede on appeal), that Westoil Corporation has no standing because it was not sued, and that Westoil Partnership claims ownership of the policies and only one party is entitled to do so. They also maintained that Westoil Corporation could not "arise from the dead" after its dissolution and become a plaintiff. On June 20, 1997, the trial court denied leave to amend, stating that Westoil Corporation's motion ". . . fails because there is no current dispute between the proposed plaintiff and defendant."

## ISSUES

Appellants raise three issues on appeal: (1) Did Westoil Partnership receive the benefits of the policies *by operation of law* following Westoil Corporation's "merger" with it? (2) Did respondents waive, or are they estopped from, claiming that the policies did not pass *by operation of law* to Westoil Partnership by reason of their reservation of rights letter? (3) Did the trial court err in denying appellant's motion to amend to add Westoil Corporation as a plaintiff?

## DISCUSSION

An appellate court, in reviewing the granting of a summary judgment motion by the trial court, is called upon to make a de novo determination of whether there is a triable issue of fact and whether the moving party is entitled to judgment as a matter of law. (*Butcher* v. *Gay* (1994) 29 Cal.App.4th 388, 399 [34 Cal.Rptr.2d 771].)

In the underlying actions brought by Western Fuel, Westoil Partnership is claimed to be liable for the torts of Westoil Corporation under the doctrine established by the Supreme Court in *Ray* v. *Alad Corp.* (1977) 19 Cal.3d 22 [136 Cal.Rptr. 574, 560 P.2d 3]. *Ray* held that a party which acquires a manufacturing business and continues the output of its line of products assumes strict tort liability for defects in products manufactured by the entity from which the business was acquired. (*Id.* at p. 34.) The Supreme Court justified its new rule upon the destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business. Without such a rule, a plaintiff ". . . would face formidable and probably insuperable obstacles in attempting to obtain satisfaction of the judgment from former stockholders or directors [of the original manufacturer]." (*Id.* at p. 32.) "Imposing this liability upon successor manufacturers . . . not only causes the one 'who takes the benefit [to] bear the burden' (Civ. Code, § 3521) but precludes any windfall to the predecessor that might otherwise result from (1) the reflection of an absence of such successor liability in an enhanced price paid by the successor for the business assets and (2) the liquidation of the predecessor resulting in avoidance of its responsibility for subsequent injuries from its defective products." (*Id.* at p. 34.) Noting that the record did not disclose whether the predecessor had liability insurance, the Supreme Court observed: "Although such coverage is not inconceivable [citations] . . . products liability insurance is usually limited to accidents or occurrences taking place while the policy is in effect. [Citations.] Thus the products liability insurance of a company that has gone out of business is not a likely source of compensation for injury from a product the company previously manufactured." (*Id.* at p. 32.)

Appellant contends that a de facto merger took place between Westoil Corporation and Westoil Partnership that transferred the benefits of the policies from the former to the latter as a matter of law. Appellant concedes, as it must, that the policies do not automatically follow liability imposed by *Ray* on Westoil Partnership as a successor to Westoil Corporation. *General Accident Ins. Co.* v. *Superior Court* (1997) 55 Cal.App.4th 1444, 1454-1455 [64 Cal.Rptr.2d 781] held ". . . the finding of successor liability in tort does not entitle the successor corporation, by operation of law, to the insurance coverage of its corporate predecessor. . . . [A] transfer by operation of law is a violation of the basic principles of contract and is also bad public policy. Under the superior court's order, an insurer which was never a party to an insurance contract would be held liable to an 'insured' that has never paid a premium or been subjected to an underwriting analysis." *Quemetco Inc.* v. *Pacific Automobile Ins. Co.* (1994) 24 Cal.App.4th 494 [29 Cal.Rptr.2d 627] reached a similar holding. However, appellant points out that *General Accident Ins. Co.* and *Quemetco Inc.* provided that in the case of a de facto

merger, the benefits of insurance policies would inure to the successor entity. In *General Accident Ins. Co.,* the successor corporation argued that its takeover of the predecessor corporation amounted to a de facto merger entitling the successor to the predecessor's insurance coverage. At the conclusion of the opinion, the court stated: "The superior court did not reach the issue of . . . de facto merger, in its summary judgment ruling. . . . [The successor corporation] has two remaining theories on which it may *legitimately* attempt to defeat petitioners' summary judgment motion. Upon remand, the superior court shall proceed to determine the summary judgment motion on the issues of express assignment and de facto merger." *(General Accident Ins. Co.* v. *Superior Court, supra,* 55 Cal.App.4th at p. 1455, italics added.) Thus, a de facto merger passes the benefits of the insurance policies of the predecessor entity to the successor entity. *Quemetco Inc.* did not reach a different conclusion. There, in response to a contention that a merger transferred the obligations of an insurer of a predecessor to the surviving corporation, the court stated: "However, the cases cited by appellant applied state corporation law regarding mergers, and appellant is not a surviving corporation of a merger. The sale of the assets here did not amount to a merger, . . ." *(Quemetco Inc.* v. *Pacific Automobile Ins. Co., supra,* 24 Cal.App.4th at p. 501.)

The question before us is whether the change in the form of ownership of Westoil Terminals Co. effected by the Miller family from one of corporate to limited partnership ownership—with the same operations as before, under the same name, with the same equity interests and under the same control—falls within the merger exception referred to in *General Accident Ins. Co.* and *Quemetco Inc.* We hold that it does; to reach an opposite conclusion would exalt form over substance and violate the maxim of jurisprudence set forth in Civil Code section 3528: "The law respects form less than substance."

Respondents raise several arguments in opposition. They contend that *General Accident Ins. Co.* and *Quemetco Inc.* do not provide for a de facto merger exception. As indicated, we disagree. Respondents contend that under the law existing in 1986 a corporation could not merge with a limited partnership and cite the following language from 15 Fletcher, Cyclopedia of the Law of Private Corporations (rev. 1990) section 7153, pages 346-347: "Corporations must have legal authority to consolidate or merge. Consequently, *where there is no law authorizing the particular consolidation or merger neither a de jure nor a de facto consolidation or merger results . . . .* [¶] The company thus formed can neither acquire rights nor incur liabilities as a consolidated company." (Italics added, fn. omitted.) Assuming, for the sake of discussion, that this citation is a correct statement of the law, its application would result in Westoil Partnership's not acquiring the rights to

the policies from Westoil Corporation. As the policies must be owned by someone, it must follow that they would still be owned by Westoil Corporation.

Respondents cite *Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1 [52 Cal.Rptr.2d 690] for the proposition that a merger of one company into another after the acquirer's insurance policies expired did not make the merged company an insured under the policies. However, *Armstrong World Industries, Inc.*, dealt with interpreting the specific terms of policies covering GAF, " 'and/or its subsidiary, associated, and affiliated companies or owned and controlled companies as now existing or hereafter constituted' " to determine who was a " 'named insured.' " (*Id.* at p. 79.) The court held that the language " 'or hereafter constituted' " was confined to the policies' periods. (*Ibid.*) Thus, Rubberoid, acquired after the policies' periods ended, was not a *named insured* under the definition of that term under the policies. (*Ibid.*)

Respondents claim that, since the policies provide that the insurer must consent to an assignment and none was obtained, the policies were not transferred to Westoil Partnership. ■ Assuming, for the sake of discussion, that there was an assignment, *Greco* v. *Oregon Mut. Fire Ins. Co.* (1961) 191 Cal.App.2d 674 [12 Cal.Rptr. 802] allows for an exception to that rule where a loss has already occurred. "The policy by its own terms, insofar as it involved the substitution of one insured for another, was not assignable without the consent of the insurer. Any purported assignment of such a policy without consent is ineffective. [Citations.] On the other hand, it is settled that the right to recover thereon after loss has occurred is assignable without company consent. [Citations.] The former situation involves the obligation of the insurance company to indemnify a particular person against loss; the selection of its indemnitee properly is a matter of its own choice. The latter situation involves only the payment of a claim founded upon a loss against which the policy indemnifies, and the designation of a payee of such claim properly is a matter left solely to the discretion of the indemnitee, viz., the insured." (*Id.* at p. 682.) In the matter before us, the loss occurred during the policies' periods in the early 1970's. The transfer of the policies to Westoil Partnership in 1986 was well after the loss and after the California Regional Water Quality Control Board, Los Angeles Region, issued its order No. 85-17 ordering Western Fuel to investigate hydrocarbon pollutants at its facility in San Pedro.[2]

Respondents argue that an assignment of the policies increased the risk to respondents. As is stated in *Quemetco Inc.*, "The purpose of consent

---

[2]Thus, *Quemetco Inc.* v. *Pacific Automobile Ins. Co., supra,* 24 Cal.App.4th at pages 502-503, is distinguished as there the facts do not reflect that the governmental authorities had commenced their investigation of the pollution before the sale of assets to the successor

provisions is ' "to prevent an increase of risk and hazard of loss by a change of ownership without the knowledge of the insurer." ' [Citation.]" (*Quemetco Inc.* v. *Pacific Automobile Ins. Co., supra,* 24 Cal.App.4th at p. 503.) Inasmuch as the loss occurred in the early 1970's, any transfer of the policies in 1986 did not in any fashion increase the risk to respondents. Respondents argue that it would be a hardship to defend both Westoil Corporation and Westoil Partnership. Since there is only one loss to defend, which occurred before Westoil Partnership was created, respondents' claim of hardship is ill-founded.

Respondents claim the policies were not transferred to Westoil Partnership by Westoil Corporation, yet when Westoil Corporation sought to join the suit and claim its benefits under the policies, respondents opposed, claiming a "dead" corporation cannot sue. In this regard, they are wrong. ■ In *Peñasquitos, Inc.* v. *Superior Court* (1991) 53 Cal.3d 1180 [283 Cal.Rptr. 135, 812 P.2d 154], the Supreme Court held that parties may bring suit against dissolved corporations for damages that occurred or are discovered after dissolution. The court observed that "Plaintiffs will be likely to assert postdissolution causes of action only if there is a prospect of recovery from the dissolved corporation's *liability insurance,* from undistributed assets, or from assets of the corporation discovered after dissolution. . . . Similarly, if the corporation has *liability insurance coverage,* its dissolution provides no reason to excuse the insurer from defending the action and indemnifying those injured by the predissolution activities of its insured, just as a corporation's insolvency or bankruptcy does not release its insurer from payment for damages the corporation has caused [citation]." (*Id.* at pp. 1191-1192, italics added.) The Supreme Court goes on to state: "If a dissolved corporation possessed a claim that arose after its dissolution, presumably it would be permitted to assert it, just as an estate is permitted to prosecute a cause of action arising after the decedent's death [citation]." (*Id.* at p. 1192, fn. 8.) ■ Thus, Westoil Corporation, although dissolved, may bring suit against respondents to obtain the insurance benefits for which it paid, assuming, for the sake of discussion, respondent is correct that the policies were not transferred to Westoil Partnership in 1986.

Respondents also argue, and the trial court agreed, that there is no "justiciable controversy" involving Westoil Corporation. Code of Civil Procedure section 1060 provides that "Any person interested under a written instrument . . . or under a contract . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an . . . action . . . for a declaration of his or her rights and duties . . . ." In this

corporation as is the case here. On the contrary, it appears in *Quemetco Inc.* that the sale preceded discovery by as much as a decade.

matter, Westoil Corporation seeks a determination that the policies for which it paid cover a claim made against it by Western Fuel in the underlying cases, thus falling within the provisions of section 1060. Respondents cite but one case in support of their position: *Searle* v. *City of Berkeley Rent Stabilization Bd.* (1988) 197 Cal.App.3d 1251 [243 Cal.Rptr. 449]. The closest *Searle* gets to the issue at hand is a reference in a footnote that plaintiffs' (landlords') objections to the Berkeley Rent Stabilization Board procedure for individual rent adjustments were "premature. Because Landlords are still going through the . . . process . . . their assertion of its inadequacy is perforce largely speculative." (*Id.* at p. 1258, fn. 6.) Simply put, the landlords in *Searle* had failed to exhaust their administrative remedies, a different situation than the case at hand.

In conclusion, we have determined that Westoil Partnership is provided coverage by the policies in issue by reason of the agreement between it and Westoil Corporation. If, for the sake of discussion, coverage was not transferred to the limited partnership, we have determined that the policies belong to Westoil Corporation and it can bring suit against respondents. We note that Western Fuel could have brought suit against Westoil Corporation, the alleged wrongdoer. The resolution of the instant matter cannot be allowed to turn on Western Fuel's election to sue the limited partnership entity rather than Westoil Corporation. As it is certain that respondents must provide coverage to one of the two entities, an injustice would result if, by treating the entities separately, it would be concluded that neither is covered by the policies in issue.

As we have determined that coverage exists under the policies in issue, it is not necessary for us to decide the issue relating to waiver and estoppel in connection with respondents' reservation of rights letter.

### DISPOSITION

Judgment is reversed. The trial court is directed to enter a new order permitting the filing of Westoil's proposed first amended complaint. Appellant is awarded costs on appeal.

Boren, P. J., concurred.

**ZEBROWSKI, J.,** Dissenting.—As respondent insurers note: "Even in a shell game, there is only one pea." The respondent insurers contracted to defend and indemnify only one insured. The majority now extends respondents' duty to a second party, a noninsured. I therefore respectfully dissent. I would hold that the trial court ruled correctly on all issues, and would affirm.

Respondent insurers issued policies insuring only Westoil Corporation. Westoil Partnership is a different legal entity and is not a named insured. Although Westoil Corporation long ago dissolved, it remains subject to suit. (*Peñasquitos, Inc.* v. *Superior Court* (1991) 53 Cal.3d 1180 [283 Cal.Rptr. 135, 812 P.2d 154].) The Supreme Court in *Peñasquitos*, in a unanimous decision, expressly noted that a motivation to sue a dissolved corporation could be provided by liability insurance. (*Id.* at p. 1191.) Hence the named insured, Westoil Corporation, could have been sued at the time that Westoil Partnership was sued, and can still be sued. Respondent insurers hence remain exposed to the possibility of being required to defend and possibly to indemnify Westoil Corporation. Granted, it might appear odd to speak of "indemnifying" a defunct corporation, since a defunct corporation without assets cannot really be damaged. However, if respondent insurers refused to defend their insured, Westoil Corporation, and if a third party plaintiff obtained a judgment against Westoil Corporation on a claim within the scope of the coverage, that judgment could then be enforced against respondent insurers. (See, e.g., Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1998) ¶ 1:27.) Under *Peñasquitos* and the laws regarding enforcement of judgments, therefore, respondent insurers remain exposed to the possible liabilities of Westoil Corporation.

Appellant's opening brief does not mention *Peñasquitos* until page 50 (the last page allowed). However, it then acknowledges that dissolution of a corporation does not terminate an insurer's obligation to defend and indemnify the dissolved corporation. Appellant thus concedes that Westoil Corporation remains subject to suit, and that respondent insurers thus remain liable to defend and indemnify Westoil Corporation. However, appellant's brief proceeds to draw from these factual concessions the seeming nonsequitur that if respondent insurers must defend and indemnify the named insured, they should also have to defend noninsured Westoil Partnership as well. Although the conclusion does not follow from the premise, the argument does confirm that appellant is overtly arguing that respondent insurers' defense and indemnification obligations should be judicially expanded from one insured to two.

The potential for suit against a dissolved corporation is not merely a remote theoretical possibility. By way of example, substantial litigation has proceeded against Montrose Chemical Corporation in recent years arising out of Montrose's long-closed DDT manufacturing operations in Torrance. The insurers which issued policies to Montrose covering the relevant periods have expended considerable sums responding to these suits, and this litigation has produced several appellate opinions. Although Montrose Chemical Corporation may not have dissolved, its insurers would have to respond

under *Peñasquitos* even if Montrose were dissolved, and would have to incur the significant costs involved. Similarly, respondent insurers in this case will have to respond should Westoil Corporation be sued.

In view of the allegations in this case, Westoil Partnership itself has (unless it contracted it away) a claim for indemnity against Westoil Corporation. As Westoil Partnership itself states in its brief, it "seeks coverage under those policies for events that occurred during the policy periods." During the policy periods referenced, the site was operated by named insured Westoil Corporation. The interests of Westoil Partnership and Westoil Corporation hence appear to be adverse. This adversity should preclude representation of both these entities by the same counsel. It would be more expectable to find appellant's counsel representing Westoil Partnership in a suit against Westoil Corporation, in order to trigger Westoil Corporation's insurance coverage under *Peñasquitos*, rather than attempting to represent both of these diverging interests. Even after conclusion of the instant litigation in the trial court, Westoil Partnership could have sued Westoil Corporation for indemnity, and perhaps still can (the record does not reveal precisely when the statute of limitations on such an indemnity claim would expire). Hence no party was deprived of the opportunity to seek the benefits of the insurance policy; all that was required was a suit against the named insured.

One possible explanation for why Westoil Partnership did not simply sue Westoil Corporation might be the fact that different counsel would then be appointed by respondent insurers to defend Westoil Corporation. It thus appears at least plausible that the litigation strategy pursued in this case was motivated by a desire to have the same counsel represent both entities, and that the law of insurance, contracts or corporations was not the motivation. A possible alternative explanation for why Westoil Partnership did not simply sue Westoil Corporation in order to reach the insurance coverage under *Peñasquitos* is the contractual arrangements between Westoil Partnership and Westoil Corporation. The record reflects that Westoil Partnership agreed to assume all of Westoil Corporation's liabilities. Whether this agreement would operate to exonerate respondent insurers from defending and indemnifying their named insured, Westoil Corporation, is not determinable from this record. Nor does the record reflect the precise reason for Westoil Partnership's agreement to assume liabilities, but the reason may have been to obtain tax benefits for the Westoil Partnership partners or to avoid the necessity of cash payments to Westoil Corporation, or both. The reason does not matter in any event, for whatever contractual arrangements might have been agreed to between Westoil Corporation and Westoil Partnership cannot have magnified respondent insurers' obligations under their policies. Nor is

there is any legal basis on which respondent insurers' contractual obligations can be expanded in order to relieve the Westoil Partnership partners from the possibly adverse effects of the manner in which they chose to structure their business operations, for tax purposes or otherwise.

The majority's observation that "[t]he transfer of the policies to Westoil Partnership in 1986 was well after the loss and after the [government] issued its order . . . ordering Western Fuel to investigate hydrocarbon pollutants at its facility . . ." is not a reason for reversal. (Maj. opn., *ante*, at p. 641.) By this observation, the majority makes the point that the right to recover under the policies for covered events that had already occurred may have been assignable in 1986, when Westoil Partnership was created. That may be true, but the fact remains that the policies were not then assigned. If they had been, then perhaps there would be only one named insured to be defended and indemnified (the assignee), or perhaps there would be an agreement by respondent insurers to assume obligations to a second insured (possibly after the payment of an additional premium). But there was no assignment. Whether the policies could be assigned now, assuming respondent insurers would consent to assignment, is problematic, since Westoil Corporation now has no officers to effect an assignment. With the policies still covering Westoil Corporation, Westoil Corporation remains a solvent target defendant for environmental claims. As noted above, should Westoil Corporation be sued, respondent insurers will be forced to respond on behalf of Westoil Corporation. Respondent insurers have never agreed to expand their reponse obligations to encompass Westoil Partnership. Hence there was no impropriety in respondent insurers' refusal to agree to defend and indemnify noninsured Westoil Partnership.

As the trial court noted, Westoil Corporation was simply not sued, either directly by a third party or by Westoil Partnership in a cross-complaint. Westoil Partnership, the entity which was sued by a third party, is not a named insured. By ruling that the policies issued by respondent insurers cover not only the named insured, but also Westoil Partnership, the majority has imposed upon respondent insurers a duty to defend and indemnify an entity with whom respondent insurers never contracted and from whom respondent insurers never received a premium. I find no legal basis for this uncompensated expansion in respondent insurers' duties, and no basis for exposing respondent insurers' to a bad faith claim merely for denying coverage to an uninsured entity. There was no de facto "merger" here. A merger causes two independent entities to become one, leaving only one entity to be defended and indemnified. In the instant situation, there are quite clearly still two different entities—Westoil Corporation, which can still be sued pursuant to *Peñasquitos*, and Westoil Partnership, which still owns the

terminal and administers the lease and was in fact sued. These two entities never "merged" into one on the facts in this record.

Appellant Westoil Partnership accuses respondent insurers of attempting to "cloud the issues," and advances such contentions as "[t]he undisputed facts provide the clarity [that the respondent insurer] fears and compel reversal of the trial court's ruling. Appellant paid premiums . . . ." Such passages indicate that it is appellant Westoil Partnership that is attempting to "cloud the issues." Quite clearly, appellant *never* paid a premium. Statements such as this in appellant's briefing simply cannot be correct. Appellant Westoil Partnership *did not even exist* at the time the premiums were paid. The premiums were paid by Westoil Corporation, not by Westoil Partnership. For reasons such as this, Westoil Partnership's briefing must be read with "a grain of salt," and I fear this style of briefing may have misled the majority.

Nor can thoughts that a defense of noninsured Westoil Partnership might achieve res judicata render this a "no harm, no foul" situation. Since Westoil Partnership and Westoil Corporation are different legal entities, a successful defense of Westoil Partnership would not render res judicata a similar suit against Westoil Corporation. Nor would an unsuccessful defense, followed by payment of a judgment, or a settlement, render res judicata a possible future suit against Westoil Corporation. A plaintiff who litigated to judgment against, or settled with, Westoil Partnership would not be barred from advancing the same claims against Westoil Corporation, or at least not obviously so. Hence the majority's finding that respondent insurers owed defense duties to Westoil Partnership, coupled with the Supreme Court holding in *Peñasquitos*, means that respondent insurers have now been charged with a duty to defend the same claims not merely once, as they contracted to do, but twice. This is a substantial uncompensated modification of respondent insurers' contractual duties. I therefore dissent.

A petition for a rehearing was denied April 19, 1999. Zebrowski, J., was of the opinion that the petition should be granted.