121 Cal.Rptr.2d 259 (2002)
99 Cal.App.4th 400
ASSOCIATED AVIATION UNDERWRITERS, INC., Plaintiff, Cross-defendant and Respondent,
v.
PUREX INDUSTRIES, INC. etc., et al., Defendants, Cross-complainants and Appellants.
No. B149365.
Court of Appeal, Second District, Division Five.
June 17, 2002.
Review Granted September 18, 2002.
*260 Burhenn & Gest and Howard D. Gest, Los Angeles; Weil, Gotshal & Manges, Stanley M. Spracker, Adam P. Strochak, and John B. O'Loughlin, Jr., for Defendants, Cross-complainants and Appellants.
Knapp, Petersen & Clarke, Gwen Freeman and Barry R. Gammell, Glendale, for Plaintiff, Cross-defendant and Respondent.
Certified for Partial Publication[*]
ARMSTRONG, J.
Between January of 1967 and August of 1971, respondent Associated Aviation Underwriters, Inc. ("AAU"), insured the Pacific Airmotive Corporation, an aircraft engine repair business in Burbank. Pacific *261 Airmotive's parent corporation, Purex Corporation, Ltd, was a named insured with respect to liabilities arising out of Pacific Airmotive's business activities. In the 1980s, the insured corporations were reformed and restructured in varied and interesting waysthe exact nature of those transactions is in dispute here. By the 1990s, neither Purex California nor Pacific Airmotive existed. What did exist were lawsuits alleging that Pacific Airmotive's business activities during AAU's policy periods caused damages.
Appellants UNC Pacific Airmotive Corporation, Inc. and UNC, Inc. (collectively, "UNC"),[1] and a corporation the parties refer to as "New PII" (New Purex / ndustries / nc.) were sued in those actions. They sought coverage from AAU. Appellants contended that they were the successors to Pacific Airmotive's insurance rights and New PII contended that it was the successor to the Purex Corporation's insurance rights.
AAU filed this action for declaratory relief, seeking, inter alia, a declaration that it had no duty to defend or indemnify either appellants or New PII with respect to claims arising out of the Burbank site. (In large part, appellants were found liable for damages, and New PII was not.) Appellants cross-complained for breach of the insurance contracts and for declaratory relief. Court trial was held on a single issue, whether appellants and/or New PII were insureds under the policies.[2] The trial court found that New PII was an insured and that appellants were not, and entered judgment on the complaint and cross-complaint on that basis. The question of New PII's status as an insured is not before us. As to the ruling regarding appellants, we reverse.

FACTS
First, the nomenclature: the parties refer to the Pacific Airmotive Corporation as "PAC-Cal," that is, Pacific Airmotive California, in recognition of the fact that a corporation called Pacific Airmotive was later formed in Delaware, and refer to Purex Corporation, Ltd. as "Purex California," in recognition of the fact that corporations with (for our purposes) regrettably similar names were formed later. We adopt those usages here.
PAC-Cal was the named insured on the first AAU policy, which took effect on January 1, 1967. In 1968, Purex California bought PAC-Cal as a wholly owned subsidiary and the AAU policy was endorsed to include Purex California as a named insured with respect to PAC-Cal's operations, properties, and exposures. The policy for the following year insured both corporations, for PAC-Cal's operations.
Both policies were aviation liability policies which obligated AAU to pay all sums which the insureds became obligated to pay as damages because of personal injury or injury to or destruction of property, caused by an occurrence (as defined) arising out of: "(1) the ownership, maintenance or use of any aircraft ... (3) The ownership, maintenance or use of any premises and all operations which are necessary or incidental thereto." The policies included a standard assignment clauses which read "Assignment of interest under *262 this policy shall not bind the Insurer until its consent is endorsed hereon." The parties here agree that AAU was never asked to consent to any assignment of the policies, and never did so.
In 1978, Purex California became a wholly-owned subsidiary of a new, publicly traded corporation called Purex Industries, Inc. ("Old PII"), a holding company whose sole asset was the stock of Purex California.
More complicated transactions took place in 1982. Appellants characterize the transactions as a management, or leveraged, buyout, and a de facto merger. AAU characterizes them as the sale of a business. Each party introduced evidence in support of its position, but the basic facts were undisputed. They involved the creation and demise of holding companies, the creation of new, "mirror" subsidiaries, and the restructuring of the remaining corporate entities. They are also in large part irrelevant to our disposition.
The relevant facts may be briefly summarized: In July of 1982, in anticipation of the merger or sale, PAC-Cal merged into Purex California and became the Pacific Airmotive division of Purex California. In August, numerous additional transactions took place. By the end of that month, the assets and liabilities of the Pacific Airmotive division of Purex California had been transferred to a corporation called Pacific Airmotive Delaware ("PAC-Del"). PAC-Cal did not exist, and neither did Old PII. Instead, PAC-Del was a subsidiary of the new parent company, Purex Industries Inc.New PII.[3]
The next significant transaction took place in November of 1985, when New PII sold the stock of PAC-Del to UNC Inc., retaining substantial insurance rights in the transaction. New PII and UNC Inc. also entered into an Environmental Matters Agreement which allocated responsibilities for certain pending environmental matters. It did not address the environmental matters underlying this lawsuit, apparently because the parties were not aware of the problem.

The underlying litigation
Appellants sought insurance coverage for a lawsuit brought by Lockheed-Martin in federal court, and lawsuits brought by individuals in state court. The individuals brought tort claims alleged to have arisen out of environmental contamination in the San Fernando Valley. Defendants included Lockheed, appellants, and New PII. Most or all of the claims were settled in 1998.
The Lockheed-Martin suit had its origin in an action by the United States Environmental Protection Agency which resulted in Lockheed-Martin's 1991 agreement to treat groundwater contamination in the San Fernando Valley Superfund Site. In 1995, Lockheed-Martin sued appellants, seeking contribution for the cost of remediation at a property in Burbank which PAC-Cal had sold to Lockheed. The lawsuit was assigned to U.S. District Court Judge Mariana R. Pfaelzer.
In May of 1996, appellants filed a third party complaint against New PII in the Lockheed federal court action, alleging that New PII was liable to Lockheed to the extent that appellants were. New PII tendered the claim to AAU, which provided *263 a defense. Appellants later filed a similar suit against New PII in state court, also alleging that New PII had breached the sales agreement and made misrepresentations of fact.
In June of 1997, Judge Pfaelzer issued findings of fact in the Lockheed federal court action, finding appellants responsible for certain past and future costs of remediation and cleanup.
In January of 1998, appellants and Lockheed settled the federal court action. In June of that year, appellants and New PII entered into a settlement of appellants' third party complaint against New PII in the Lockheed federal court action and of appellants' state court action against New PII. As part of the settlement, the New PII-UNC sales agreement was modified to provide that both appellants and New PII would pursue coverage from AAU and that "[New PII] agrees, to the extent necessary, to modify the Acquisition Agreement for the sole purpose of allowing the UNC parties to exercise their rights as provided herein to insurance coverage for indemnified claims."

The arguments in the trial court in this litigation
The trial court ruling was based in large part on the application of two cases which considered questions of insurance rights after mergers or sales of businesses, Quemetco Inc. v. Pacific Automobile Ins. Co. (1994) 24 Cal.App.4th 494, 29 Cal. Rptr.2d 627 and Westoil Terminals Co. v. Harbor Ins. Co. (1999) 73 Cal.App.4th 634, 86 Cal.Rptr.2d 636.[4] We briefly summarize: In Quemetco, the original insured sold all of its assets to an unrelated corporation. Years later, that corporation sought coverage for CERCLA claims alleged to have arisen from the original insured's acts. The Court of Appeal held that when a business is sold in an asset sale, insurance policies do not pass from the seller to the buyer by operation of law. (Id. at p. 501, 29 Cal.Rptr.2d 627, see also General Accident Ins. Co. v. Superior Court (1997) 55 Cal.App.4th 1444, 64 Cal. Rptr.2d 781.)
Quemetco noted that the rule is different where the transaction is a merger or a de facto merger, rather than an asset sale. (Id. at p. 501, 29 Cal.Rptr.2d 627.) Westoil found a transfer of insurance rights through a de facto merger. In Westoil, the shareholders of the original insured traded their shares for partnership interests in a new partnership. All the assets and liabilities of the original insured were transferred to the partnership, although there was no specific mention of insurance. (Westoil, supra, 73 Cal.App.4th at p. 637, 86 Cal.Rptr.2d 636.) The Westoil court found that, under the facts before it, the transaction was a de facto merger and the insurance coverage was transferred. (Id. at p. 640, 86 Cal.Rptr.2d 636.)
Both Quemetco and Westoil also considered the consent to assignment clause, and the effect of the long-standing rule that after a loss, an insurance policy can be assigned without insurer consent, the assignment clause notwithstanding. (Greco v. Oregon Mut, Fire Ins. Co. (1961) 191 Cal.App.2d 674, 682-684, 12 Cal.Rptr. 802.) The two cases reached different conclusions.
Quemetco found that the policies in that case were not effectively transferred in the sale, because the insurer did not consent to the assignment, reasoning that at the time of the Quemetco sale, there was no "loss or *264 injury or accrued right to collect the [insurance] proceeds." (Id. at p. 503, 29 Cal. Rptr.2d 627.) In Westoil, the underlying lawsuit was brought by an entity which had leased a chemical storage facility from the original insured and alleged that the storage facility had polluted adjacent lands. Westoil held that consent to assignment was not required because the loss occurred during the policy periods, and that transfer of the policies took place well after the loss. (Westoil, supra, 73 Cal.App.4th at p. 641, 86 Cal.Rptr.2d 636.)[5]

The trial court findings in this litigation
Regarding appellants, the trial court reasoned that with the July 1982 merger of PAC-Cal into Purex California, PAC-Cal ceased to exist and that its rights to the AAU policies passed to Purex California (which of course was a named insured in its own right). The court cited Westoil, supra. The court then reasoned that because PAC-Cal did not exist in August of 1982, the August transactions were not a merger of PAC-Cal into a new entity, but were a sale of assets and liabilities, so that Quemetco applied and PAC-Cal's rights were not transferred to PAC-Del (or any of the interim entities).
The trial court also found that unless the consent to assignment clauses were enforced, AAU would face an increased risk of having to defend two entities with competing interests, when it had only agreed to insure two entities with identical interests. The court concluded that the policies were not effectively transferred in the asset sales because AAU did not consent to the assignment.

DISCUSSION
For all its complications, this case can be briefly summarized, and that summary does not concern de facto mergers or asset sales. The fundamental fact is that AAU wrote insurance for claims arising from PAC-Cal's operations during the policy periods. It is now being asked to provide coverage for just that kind of claim. If none of the mergers, sales, or transactions, however labeled, had taken place, AAU would have been obliged to defend and indemnify PAC-Cal and Purex California on those claims. It is now obligated to defend and indemnify appellants and New PII.[6]
In an insurance contract, the relationship is often asymmetrical: the insured will have fully performed, by paying premiums, long before the insurer is called on to perform at all. It simply makes no sense to say that any part of AAU's obligation was obliterated in the interval between the insureds' performance and its own, in June of 1982, or in August of 1982, or in 1985, in transactions that had nothing to do with the insured events or AAU's obligations. AAU knew nothing of the merger of PAC-Cal into Purex California, or the New PII-UNC transaction, or the other corporate transformations. AAU did not price its policy or evaluate its risk based on any of those events. There is no logical reason to absolve AAU of its duties simply because the heirs to the liability *265 have different names, corporate forms, or owners.
Mergers, sales, and corporate restructurings and transformations are hardly unusual. To the contrary, they may be said to be commonplace among commercial insureds such as Purex California and PAC-Cal. They do not, of themselves, operate to obliterate any of an insured's rights to coverage for activities which took place prior to the merger, sale, or other transaction. To hold otherwise would provide an unfair windfall to insurers.
AAU contends, however, that if appellants are found to be insureds, the risk it agreed to insure would be increased. It argues that the litigation between appellants and New PII establishes that fact, because it now has two insureds engaged in litigation with each other. The fact is, though, that such a lawsuit could have arisen between the two original insureds, Pacific Airmotive and Purex California, or at almost any point along the way. And, while it is true that New PII was brought into the Lockheed litigation by appellants, not directly by Lockheed, the controversy between appellants and New PII (other than the breach of contract issues) was New PII's liability to Lockheed for the activities of PAC-Cal. AAU always had two insureds. The transactions of the 1980s did not increase its risk.
AAU also argues that it did not consent to any assignment of the insurance. It acknowledges the rule that the right to recover under a policy after a loss has occurred is an asset assignable separate from the policy itself and that after a loss, the policy can be assigned without insurer consent, the assignment clause notwithstanding. (Greco v. Oregon Mut. Fire Ins. Co., supra, 191 Cal.App.2d at p. 682-684, 12 Cal.Rptr. 802.) AAU argues, however, that a loss does not occur until there is a legal finding of liability.
We cannot agree with that proposition. Instead, we agree with Northern. Ins. Co. that "the rationale for honoring `no assignment' clauses vanishes when liability arises from presale activity." (Northern Ins. Co., supra, 955 F.2d at p. 1357; Westoil supra, 73 Cal.App.4th at p. 641, 86 Cal.Rptr.2d 636.) "What is relevant is whether the predecessor's acts occurred before the sale, not whether they matured into cognizable causes of action before that time." (Quemetco, supra, 24 Cal.App.4th at p. 507, 29 Cal.Rptr.2d 627, Johnson, J. dis.)
The purpose of the consent-on-assignment clause "is apparent. It is `to prevent an increase of risk and hazard of loss by a change of ownership without the knowledge of the insurer.' (16 Couch on Insurance 2d (1966) § 63.31, p. 677; fn. omitted.) As stated in Bergson v. Builders' Ins. Co., 38 Cal. 541, 545, `The insurer has a right to know, and an interest in knowing, for whom he stands as insurer. He may be willing to insure one person and unwilling to insure another, while the owner of a particular parcel of property. He may have confidence in the honesty and prudence of the one in protecting the property and thereby lessening the risk, and may have no confidence in the other.'" (University of Judaism v. Transamerica Ins. Co. (1976) 61 Cal.App.3d 937, 941, 132 Cal.Rptr. 907.)
Under the rule AAU suggests, an insurer could avoid its obligations on hosts of pending claims, from products liability to car accidents, by refusing consent to assignment if the insured business was sold. That is not the law.
Thus, an insurer may not be required, through an assignment without consent, to insure an entity whose products or practices it has not rated or to take *266 on risks it might have chosen to decline. Here, however, AAU chose its insureds, chose to take on the risk of lawsuits like the underlying suits here, and collected premiums based on its decision. It is not being forced into an insuring relationship with a stranger. Instead, it is being asked to perform on precisely the risk it insured.
Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co. (1996) 45 Cal.App.4th 1, 52 Cal.Rptr.2d 690, cited by AAU, proves the point. There, a corporation, GAF, sought products coverage under its own insurance, but for the products of a company it merged with after the policy period. The Court found no coverage, noting that the insurance company collected premiums based on GAF's sales, and that "[u]nless coverage has been triggered during the policy period, there is no coverage once the policy period has ended.... Thus, a corporate acquisition taking place after the policy has expired can have no retroactive effect on the identity of the named insured during the policy period." (Id. at p. 80, 52 Cal.Rptr.2d 690.) Here, coverage was triggered during the policy period, by the named insured's activities. In Armstrong, adding the acquired corporation as a named insured would have increased the insurer's risk, requiring it to cover products it had not considered and sales which it did not include in its premium calculation. Here, to the contrary, AAU chose to the cover the risk, and set and collected its premiums.
In University of Judaism, supra, 61 Cal.App.3d 937, 132 Cal.Rptr. 907 this Court held that lack of consent to an assignment did not defeat coverage on fire insurance policies for a fire which took place after the assignment. We reasoned that the assignment did not change the nature of the activity at the premises or increase the risk, so that consent would have been given if requested, and characterized the insurer's argument as asserting an arbitrary right to withhold consent "when the only apparent reason for doing so is that an intervening loss has occurred." (Id. at p. 942, 132 Cal.Rptr. 907.)[7]
AAU makes two other arguments, first contending that appellants were held liable in the Lockheed action for acts of their own, such as expanded operations in the late 1980s, which are not related to the operation of PAC-Cal. If true, those facts might provide a defense to coverage, but they are not relevant to the issue here. AAU also contends that as the result of the transactions, it has three insureds where it once had two, citing the fact that both UNC Pacific Airmotive and UNC Inc. are parties, here and below. We are cited to no evidence that the presence of both appellants means that there was any increased demand on AAU, or that for AAU's purposes, there is any distinction between the two entities. In fact, evidence introduced by AAU at trial suggests that UNC Inc.'s liability in the Lockheed action was as UNC Pacific Airmotive's alter ego. At trial, counsel for appellants described UNC Inc.'s claim thusly: "It is just asserting that to the extent that ... UNC Incorporated could ever end up satisfying any liabilities of the Pacific Airmotive business, we would equitably be entitled to insurance coverage from AAU." Such a claim cannot change the result here.

*267 The Cross-Complaint[**]

DISPOSITION
The trial court order entering judgment against appellants on AAU's complaint is reversed. The appeal from the judgment on the fourth cause of action in appellants' cross-complaint is dismissed. The judgment in favor of AAU on the third cause of action in appellants' cross-complaint is affirmed. The judgment in favor of AAU on the first, second, fifth, and sixth causes of action in appellants' cross-complaint, for breach of contract and for declaratory relief, is reversed. Appellants to recover costs on appeal.
We concur: TURNER, P.J., and MOSK, J.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1. this opinion is certified for publieation with the exception of the section entitled The Cross-Complaint.
[1] Appellants inform us that UNC Inc. is UNC Pacific Airmotive's parent.
[2] Thus, there may be additional coverage issues, not yet tried. All we hold here is that appellants are named insureds under the AAU policies. Nothing in this opinion should be construed as a holding on any issue which was not presented to us.
[3] Purex California was only partially liquidated in 1982, but it later merged into New Pll.
[4] We note, however, our Supreme Court is currently considering these issues in Henkel Corporation v. Lloyds of London, 109 Cal. Rptr.2d 302, 26 P.3d 1040 (2001) (rev. granted 7/18/2001).
[5] Appellants also relied on Northern Ins. Co. of New York v. Allied Mut. Ins. (9th Cir.1992) 955 F.2d 1353, which held that in an asset sale of a business, where liability for pre-sale occurrences has passed to the purchaser, the insurance rights for those occurrences pass to the purchaser by operation of law, and that "the rationale for honoring `no assignment' clauses vanishes when liability arises from presale activity." (Northern Ins. Co., supra, 955 F.2d at p. 1358.)
[6] For purposes of this appeal, at any rate. See footnote 2.
[7] Montrose Chemical Corp. v. Admiral Ins. Co. (1995) 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 913 P.2d 878, cited by AAU, does not hold to the contrary. At the cited pages, the Supreme Court discussed the differences between first-party and third-party insurance for purposes of the loss-in-progress rule, which is not implicated here. (Id. at p. 692, 42 Cal. Rptr.2d 324, 913 P.2d 878.) Nothing in that case establishes that for purposes of consent to assignment clauses, "loss" equates with a legal finding of liability.
[**] See footnote *, ante.