Filed 10/5/17; Certified for Publication 11/1/17 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| STEVE JAMESON,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>    Defendant and Respondent. | A147515<br><br>(City & County of San Francisco Super. Ct. No.  CGC14540429) |

Steve Jameson sued pacific Gas and Electric Company (PG&E) for wrongful termination and breach of the covenant of good faith and fair dealing.  He alleged PG&E fired him in violation of an implied-in-fact employment contract not to terminate his employment without good cause.  PG&E moved for summary judgment on the grounds that Jameson was an at-will employee and, alternatively, that PG&E had good cause to terminate him.  The trial court granted PG&E summary judgment on the basis that Jameson failed to demonstrate the existence of a triable issue of material fact as to the existence of an implied employment contract.  We affirm because, regardless of whether Jameson was an at-will employee, PG&E established it had good cause to terminate him.

## BACKGROUND

### I.  Paul Nelson Reports Retaliation

Jameson worked for PG&E for less than a year starting in 1977, then returned to PG&E seven years later in 1985.  Between 1986 and 2012 he rose in the ranks from

1

apprentice welder to construction specialist/manager. In April 2012 he was promoted to Regional Construction Manager.

In 2012 Paul Nelson, a PG&E employee who supervised hydrostatic testing of gas transmission pipes, began testing pipes on construction sites Jameson managed in PG&E's Central Valley Region. In June 2013 Nelson reported a safety issue, an unbarricaded pipe on one of Jameson's testing sites, to Scott Powell, Nelson's union shop steward. Powell reported the concern to Nelson's supervisors, Joel Mannie and Jerry Rice. Mannie forwarded Powell's email to Jameson and Jameson's supervisor, Pierre Bigras.

In August 2013 Nelson was removed from Jameson's construction sites and transferred to testing sites outside of the Central Valley Region. As a result, he sometimes had to travel three or four hours to his work assignments. In November he emailed Nick Stavropolous, an executive vice president in Gas Operations, to complain that Jameson and third-party contractors Michael Solinsky and David Yancy had retaliated against him for reporting the safety issue. Nelson wrote:

"Recently, I was placed in a situation where I needed to speak up. On a test earlier this year, I noticed a section of the test that was under pressure that the contractor neglected to barricade off from public access. I needed to make a decision of how to respond. The local lead inspector was not responding to me and I decided to contact the CM (Construction Specialist) responsible for this particular job. He also did not respond until the following day. When he did, it was an intimidating message plain and simple; 'stop asking questions, and look the other way!' The safety violation was elevated to the RCM, Steve Jameson, who called me and told me not to bring up the issues like this anymore because it 'causes problems.' He told me he would take care of it, and 'we would all come out looking good.' Later, Steve met with my supervisors and made it clear he was building a case against me unless I be removed from his area. To protect me against retaliation, my supervisor assigned me to another area across the system. The CM and Lead Inspector who covered up this incident are being rewarded with all and any work they want in the area. Is this the atmosphere we want coming out of San Bruno?"

2

Terri Winnie, the human resources director for PG&E's Gas Operations Department, assigned Nelson's complaint to human resources manager and former EEO Investigator Collins Arengo and retained employment attorney Jennie Lee to conduct an investigation. Lee, a former PG&E staff lawyer, specializes in workplace investigations and regularly advises clients on employment issues including discipline, termination and compliance with state, federal and workplace laws. She or other members of her law firm had investigated approximately one hundred violations of PG&E's code of conduct since 2012.

## II.  Lee's Report

Lee's investigation commenced in late November 2013 and lasted two months. She spent approximately 50 hours on the case and interviewed ten individuals including Nelson, Jameson, Bigras, Mannie, Rice, Powell, and Norman Soares, a senior construction manager who reported to Jameson.

In early December PG&E directed Jameson to call Lee "because of a harassment complaint filed by Nelson." Lee interviewed Jameson over the phone, her standard practice for PG&E investigations, for approximately one hour. During the interview Jameson outlined various complaints he said he and others, particularly third-party contractors, had about Nelson, including that he was inexperienced, caused project delays and "milked" overtime. Jameson denied there was any connection between Nelson's safety concerns and his own efforts to have Nelson removed from his construction sites. He told Lee he had been complaining about Nelson's performance for over a year before the safety issue arose and encouraged her to speak with Mannie, Bigras, Rice, Soares and PG&E safety coordinator Michael Bennett to corroborate this.

According to Lee's report, Rice, Mannie and Soares denied that Jameson made ongoing complaints about Nelson before the June 2013 incident. Nelson's direct supervisor, Rice, told her that if anyone including Jameson had problems with Nelson's performance, he would be aware of it. He knew of only one instance, when Nelson first started as a field engineer in early 2012, when Jameson complained Nelson was inexperienced. Other than that, Rice was unaware of any complaints about Nelson before

3

Nelson reported the safety issue in June 2013. After that Jameson's supervisor, Bigras, asked Rice to look into an allegation that Nelson was delaying jobs for personal gain. Rice did so and found nothing amiss.

Powell, the shop steward, similarly told Lee that Jameson complained about Nelson's work performance once in 2012, while Nelson was still training under Powell's supervision. But, like Rice, he received no further complaints before Nelson raised the safety concern in June 2013. Mannie told Lee that prior to the safety issue " 'no one complained to me about Paul's work or accused Paul of delaying jobs.' " Soares told her that Jameson once mentioned a problem with Nelson on one particular job, but other than that he never heard Jameson complain about Nelson's performance or accuse him of delaying work. Soares also contradicted Jameson's statement that he had complained to Soares about Nelson "gaming the system to gain overtime." Bigras told Lee he thought Jameson had raised issues early in the season when Nelson was first starting as a field engineer, but that he heard no subsequent complaints until the " 'situation came to a head' " in 2013.

Jameson told Lee that other inspectors supported his belief that Nelson "was delaying at least 20 jobs he was on," but he did not provide their names and, according to Lee's findings, none of Nelson's supervisors heard such complaints before June 2013. Jameson admitted to Lee that after the safety incident he asked Nelson's former supervisor, Keith Lovgren, to share negative feedback about Nelson with Bigras. Bigras confirmed that Lovgren called him with unsolicited "background" on Nelson, including Lovgren's view that Nelson "was a pathological liar who used the system for his own benefit" and "sued people for no reason." Jameson also asked Rice to contact Lovgren, but Rice saw no reason to do so. Bigras suggested to Mannie that he speak with Lovgren, but, like Rice, Mannie had no problems with Nelson and saw no need to speak with his former supervisor. Lee found Jameson's purported reason for reaching out to Lovgren— "to see if he was missing something" about Nelson—was not credible. Rather, she concluded the evidence supported a finding that Jameson investigated Nelson's past to influence Bigras's decision to transfer him.

4

Lee found the evidence suggested that Jameson misrepresented complaints about Nelson having conflicts with contractors to get him transferred. Her report addressed a July 16, 2013, meeting held between Rice, Jameson, contractors Yancy and Solinsky, and Nelson "to resolve their issues." Rice felt the contractors' complaints about Nelson were unwarranted because "[t]hey could not give me legitimate examples. It just sounded like [Nelson] was doing his job" by following PG&E and CPUC safety protocols.

In August Jameson complained to Bigras that Nelson was not getting along with the contractors. Bigras asked Rice and Mannie to have another meeting with Jameson and the contractors. Rice, Mannie and Yancy had not heard of any problems for the past month and thought the July 16 meeting had resolved things. But, according to Rice, at this second meeting Jameson said he wanted Nelson out of his area. When Rice asked why, Yancy said that Jameson told him Nelson had elevated more safety concerns. When Rice told Yancy that this was not true, Jameson corrected Yancy that his complaint "was not safety concerns but problems with Nelson delaying the tests." Rice and Mannie told Lee that they thought Jameson was prompting the contractors to say Nelson was delaying tests, but the contractors "could not provide him any legitimate reason for their complaints."

Rice and Mannie told Lee that after this meeting Jameson asked to meet privately with them and said "he was going to prove that Nelson was delaying jobs to 'milk' overtime." Rice felt Jameson was "stirring the pot" and "feeding the contractor" with issues. He told Lee there were no complaints about Nelson while Jameson was on vacation. Nonetheless, after the second meeting Mannie and Rice agreed it would be best to transfer Nelson away from Jameson "for his own protection." Mannie told Lee, "[i]t seemed personal. It felt like [Jameson] was going out of his way to try to build a case against [Nelson]."

Based on her investigation, Lee concluded "the evidence reflects that Jameson engaged in retaliatory conduct against Nelson. [¶] Despite the close proximity of the two events, Jameson claimed that Nelson had ongoing performance issues, which Jameson allegedly complained about to numerous witnesses. The witnesses identified by Jameson

5

as individuals who would substantiate this claim, however, denied they heard ongoing complaints about Nelson from Jameson prior to the safety incident. According to the witnesses, Jameson complained about Nelson's performance a year prior when Nelson was a new field engineer in training. After that, Nelson successfully completed his training. The witnesses stated that Nelson has worked for over a year on numerous projects without any issues or complaints. Indeed, the witnesses denied that Nelson had ongoing performance issues prior to raising the safety concern. Furthermore, the witnesses contradict Jameson's claim that Nelson delayed three-quarters of his projects. The witnesses' statements included that prior to the safety concern, '[Nelson] worked on 40 other jobs and had no problems.' The witnesses said that if there were performance issues as alleged by Jameson, they would have dealt with them. '[The performance issues] wouldn't have been ignored.' Yet, according to the witnesses, the performance issues as represented by Jameson did not happen. Moreover, the witnesses said that if Nelson delayed the projects as Jameson claimed, they would have heard complaints from others besides Jameson. They did not. . . . The witnesses also reviewed Nelson's overtime records to determine if they were out of line in comparison to other field engineers. They found nothing out of the ordinary in terms of Nelson's overtime."

Lee's report also recounted evidence that, despite his claim that Nelson's delays cost him $20,000, Jameson only asked contractors to start documenting them after the June 2013 incident; that he encouraged Nelson's former supervisors to investigate Nelson's background after the incident; and that he continued to complain about Nelson's purported ongoing problems with third party contractors after those problems were resolved. Lee concluded: "It seemed to the witnesses that Jameson had misrepresented these complaints to get rid of Nelson because of the safety incident. Based upon the totality of the circumstances, I find that the evidence reflects Jameson complain[ed] about Nelson to orchestrate his transfer in retaliation for raising safety concerns in June 2013," in violation of PG&E's code of conduct. In all of the investigations Lee had done for PG&E, this was the first time she found that a manager retaliated against an employee for making a safety-related complaint.

6

### III. Based on Lee's Report, PG&E Decides to Terminate Jameson

Winnie reviewed Lee's report and discussed her findings with the Gas Operations management team: Nick Stavropoulos, Jesus Soto Jr. (Senior Vice President, Gas Operations), and Sean Kolassa (Vice President, Investment Planning, Gas Operations). Based on the detailed nature of Lee's investigation and her experience with investigations generally and for PG&E, they accepted her finding of retaliation.

After a series of telephone conversations, Winnie, Stavropoulos, Soto and Kolassa decided Jameson's misconduct warranted immediate termination. According to Winnie, they "found that Jameson's misconduct as a high-level manager against a subordinate would have a chilling effect on employees' freedom to identify and report safety-related concerns if Jameson were permitted to continue working for PG&E. Particularly in the Gas Operations Department, it was critical for us to ensure an environment in which employees are comfortable engaging in a transparent exchange of safety-related information. Therefore, we decided to terminate Jameson's employment."

Jameson sued PG&E for wrongful termination in breach of contract and the covenant of good faith and fair dealing. PG&E moved for summary judgment on the grounds that Jameson was an at-will employee subject to termination without cause and, alternatively, that PG&E had good cause to terminate him. The court granted summary judgment on the former ground, ruling that Jameson failed to create a triable issue of material fact regarding the existence of an implied-in-fact contract not to terminate without good cause. This timely appeal followed.

## DISCUSSION

### I. Summary Judgment Standards

Summary judgment is proper when there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)[1] We generally review a ruling granting summary judgment de novo. (*Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798 (*Horn*).) "First, the reviewing court identifies the issues framed by the pleadings, because the motion must be based on the issues as so framed. [Citation.] Second, the court determines . . . if

the moving party is the defendant, whether the moving party either has negated at least one element of each of the plaintiff's causes of action, or has established every single element of a complete defense to plaintiff's cause or causes of action. [Citations.] Finally, if the moving party has established a prima facie basis for judgment in its favor, the court considers whether the opposing party has demonstrated that a triable issue of material fact exists so as to preclude summary judgment." (*Schrader v. Scott* (1992) 8 Cal.App.4th 1679, 1683–1684.) "We accept as true the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them. [Citation.] However, to defeat the motion for summary judgment, the plaintiff must show ' "specific facts," ' and cannot rely upon the allegations of the pleadings." (*Horn, supra,* at p. 805.)

We affirm the trial court's decision if it is correct on any ground the parties had an adequate opportunity to address in the trial court, regardless of the reasons the trial court gave. (*California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16, 22 (*Lujan*); *Shamsian v. Atlantic Richfield Co*. (2003) 107 Cal.App.4th 967, 975.)

## II. PG&E Had Good Cause for Terminating Jameson

Jameson's causes of action are premised on his position that PG&E's progressive discipline guidelines and code of conduct, his reliance on those policies, and his prior tenure with PG&E created an implied contract not to terminate his employment without just cause. We need not address this underlying premise because, even if true, Jameson has not shown facts to show he was terminated without just cause sufficient to preclude summary judgment.

## A. The Issue of Good Cause is Reviewable on Appeal

Preliminarily, we address Jameson's assertion that this court may not affirm the summary judgment ruling on a ground raised below but not addressed in the trial court's ruling. Jameson cites *Zak v. State Farm Mut. Liab. Ins. Co.* (1965) 232 Cal.App.2d 500, 506 (*Zak*) to argue our review is restricted to the grounds addressed by the trial court, but *Zak* holds only that the appellate court will not affirm a ruling on the basis of factual issues that were not raised before the trial court. Here, the factual basis for PG&E's

8

position that it had good cause to terminate Jameson was fully addressed in its motion for summary judgment.

Moreover, Jameson's view is contrary to the law. " 'As a corollary of the de novo review standard, the appellate court may affirm a summary judgment on any correct legal theory, as long as the parties had an adequate opportunity to address the theory in the trial court.' " (*Lujan, supra,* 112 Cal.App.4th at p. 22.) " 'Regardless of how the trial court reached its decision, it falls to us to examine the record de novo and independently determine whether that decision is correct.' [Citation.] . . . The sole question properly before us on review of the summary judgment is whether the judge reached the right *result*—i.e., entry of judgment in favor of [PG&E]—whatever path [he or she] might have taken to get there, and we decide that question independently of the trial court." (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694.) However, in accordance with Code of Civil Procedure section 437c, subd. (m)(2) we invited the parties to submit supplemental briefs on whether Jameson's termination was supported by good cause and have considered those arguments as well as the points raised in the parties' initial briefs.

## B. Jameson Did Not Establish a Triable Issue as to Good Cause

On the merits, Jameson concedes he was fired on the basis of Lee's report. But he asserts a jury could reasonably find PG&E's reliance on it was not reasonable or in good faith. He contends a jury could decide Lee was biased in favor of her former employer and that her investigation was inadequate because she failed to interview three of the witnesses he asked her to speak with and declined to follow up with him after their initial interview. And he contends that a declaration by Amy Oppenheimer, his expert witness on the conduct of workplace investigations, reveals numerous instances in which Lee's investigation and report fell below the relevant standard of care. "[M]ost importantly," he contends, "[t]he entire premise and conclusion in Lee's report is wrong" because it was Rice, not Jameson, who decided to transfer Nelson's work assignments.

These arguments are unpersuasive. The issue is not whether Lee's conclusions were correct or whether her investigation could have been better or more comprehensive.

9

The question, rather, is whether PG&E's determination that Jameson retaliated against Nelson for raising a safety issue was "reached honestly, after an appropriate investigation and for reasons that are not arbitrary or pretextual[.]" (*Cotran v. Rollins Hudig Hall Intern., Inc.* (1998) 17 Cal.4th 93, 107 (*Cotran*).) " 'Three factual determinations are relevant to the question of employer liability: (1) did the employer act with good faith in making the decision to terminate; (2) did the decision follow an investigation that was appropriate under the circumstances; and (3) did the employer have reasonable grounds for believing the employee had engaged in the misconduct.' [Citation.] '*Cotran* did not delineate the earmarks of an appropriate investigation but noted that investigative fairness contemplates listening to both sides and providing employees a fair opportunity to present their position and to correct or contradict relevant statements prejudicial to their case, without the procedural formalities of a trial.'[Citation] [¶] . . . Although the elements of the *Cotran* standard are triable to the jury, 'if the facts are undisputed or admit of only one conclusion, then summary judgment may be entered.' " (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 872–873.)

     *King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426 is illustrative. UPS terminated King after an internal investigation concluded he had falsified a driver's time card or directed the driver to do so. King sued UPS for breach of an implied contract to terminate only for good cause.[1] In affirming summary judgment, the court of appeal declined to address the existence of an implied contract superseding King's at-will employee status because he failed to raise a triable issue that his discharge was in bad faith. The court explained: "Good cause, in the context of implied employment contracts, means 'fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual.' [Citation.] The question critical to UPS's liability is not whether plaintiff in fact violated

---

     [1] He also asserted he was terminated because of a disability and that the company's purported reason for firing him was merely pretextual. Jameson, in contrast, argues only that PG&E lacked just cause to fire him, not that it fired him for a discriminatory reason.

the integrity policy by encouraging a subordinate to falsify his timecard, but whether UPS, acting in good faith following an appropriate investigation, had reasonable grounds for believing plaintiff had done so." (*Id*. at p. 438.)

So too here. PG&E met its summary judgment burden to show it acted reasonably and in good faith after an appropriate investigation determined Jameson retaliated against Nelson. The question, then, is whether Jameson demonstrated a triable issue of fact existed as to the adequacy of the investigation or PG&E's good faith in relying on it. He did not. Jameson claims a jury could find it was unreasonable for PG&E to rely on Lee's report because she declined to interview Yancy, Solinsky, and Bennett. But Lee's declaration explains she concluded from her discussion with Jameson that Yancy and Solinsky "only had information about issues they had with Nelson's work performance or about the legitimacy of the safety concern that Nelson raised, not about the issue of whether Jameson retaliated against Nelson for raising that concern. Also, Yancy and Solinsky did not appear to have any more information beyond that which I had obtained from the existing employees whom I had already interviewed." Similarly, she did not believe Bennet had knowledge about the alleged retaliation. Jameson argues these individuals could have shed light on his motivation for having Nelson transferred, but there is no evidence, either within the report or otherwise, to show that Lee circumscribed her interviews for improper reasons or that the members of the PG&E management team who decided to terminate Jameson should have found the investigative report was inadequate for that reason. "It is the employer's honest belief in the stated reasons for firing an employee and not the objective truth or falsity of the underlying fact that is at issue . . . ." (*King*, *supra*, 152 Cal.App.4th at p. 436.)

Jameson cites Oppenheimer's identification of numerous alleged flaws in Lee's investigation as evidence that her investigation fell below the relevant professional standard of care.[2] This argument fails for reasons noted in *King*. Like Jameson, the

_____

[2] Those are, in short, that Lee was "unclear and inconsistent about her role as an attorney/investigator;" had a close relationship with PG&E; did not tell Jameson he was the subject of a complaint; conducted her interviews by phone; interviewed Jameson

11

employee in *King* argued his employer's bad faith was evidenced by shortcomings in its investigation, specifically in that he was not given an adequate opportunity to rebut the allegation of wrongdoing. Affirming summary judgment, the court explained its disagreement. "Justice Tobriner reminds us that ' "[t]he common law requirement of a fair procedure does not compel formal proceedings with all the embellishments of a court trial [citation], nor adherence to a single mode of process. It may be satisfied by any one of a variety of procedures which afford a fair opportunity for an applicant to present his position . . . . [T]his court should not attempt to fix a rigid procedure that must invariably be observed." ' [Citation.] [¶] Flexibility is the signature lesson from *Cotran.* The Supreme Court is unwilling to compel employers to undertake a precise type of investigation as long as the process is inherently fair. . . . Because neutral personnel investigated the facts, eyewitnesses provided statements, and plaintiff was given an opportunity to explain what happened, we conclude UPS conducted an adequate investigation as a matter of law." (*King, supra,* 152 Cal.App.4th at p. 439–440.)

Here, just as in *King,* PG&E's evidence on summary judgment established that it satisfied the *Cotran* standard, and an expert's after-the-fact opinion that Lee's investigation was flawed in various respects does not compel a different result. Any investigation can be criticized, and a plaintiff can always assert that more should have been done, or done differently. (See, e.g., *Silva v. Lucky Stores, Inc.* (1998) 65 Cal.App.4th 256, 275.) Again, the "Supreme Court is unwilling to compel employers to undertake a precise type of investigation as long as the process is inherently fair." (*King, supra,* 152 Cal.App.4th at p. 439.) Jameson was informed of the investigation and directed early on to speak to Lee. She interviewed 10 witnesses and provided credible

while he was recovering from surgery, and the interview was "too short and not reasonably thorough;" jumped to a false conclusion that if Jameson had complained about Nelson to anyone at PG&E he would have complained to his supervisors; failed to interview "significant witnesses . . . that could exonerate Jameson;" failed to thoroughly investigate Jameson's complaints about Nelson's job performance; failed to preserve her contemporaneous notes; and did not reopen the investigation for Jameson to rebut her findings.

12

reasons for her decision not to interview three others. She produced a twelve-page report that detailed the evidence she gathered and her analysis of it. Nothing in Oppenheimer's critiques of Lee's report support a reasonable inference that the process was not inherently fair or that the PG&E managers who relied on it did so unreasonably or in bad faith.

Nor does Jameson identify sufficient evidence to support an inference that Lee was biased. He argues her bias is evident because Lee formerly worked for PG&E and now "had an ongoing working relationship with the company" through its retention of her and her law firm. Neither of those relationships supports a reasonable inference that Lee was predisposed to find Jameson retaliated against Nelson.[3] To the contrary, the only evidence on that question was Lee's uncontradicted declaration that she had never before found that a PG&E manager retaliated against an employee for raising a safety concern.

Finally, Jameson asserts the most significant evidence showing Lee's investigation was inadequate is that it was Rice's decision, not his, to transfer Nelson to remote work sites. This argument misrepresents Lee's report, which accurately recounted that Jameson *initiated* the decision by repeatedly requesting that Nelson be removed from his projects and admitted he was the catalyst in effecting Nelson's reassignment.

In sum, PG&E established on summary judgment that it employed an adequate procedure to investigate Nelson's allegation of retaliation and reasonably decided to terminate Jameson on the basis of that investigation. Jameson failed to present sufficient evidence to establish a triable issue of fact that PG&E's decision was biased or procedurally inadequate. Summary judgment was appropriately granted.

## DISPOSITION

The judgment is affirmed.

---

[3] Indeed, if either former employment with or current retention by the employer were sufficient to establish a factual issue as to bias, no termination based on an investigation by either an in-house or external investigator—in short, no termination based on a professional investigation—would ever withstand an allegation of bias on summary judgment. Such an unworkable situation cannot be the law.

13

_____
Siggins, J.

We concur:


_____
Pollak, Acting P.J.


_____
Jenkins, J.


*Jameson v. PG&E*, A147515


14

Filed 11/1/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

STEVE JAMESON,

     Plaintiff and Appellant,

v.

PACIFIC GAS AND ELECTRIC
COMPANY,

     Defendant and Respondent.

A147515

(City & County of San Francisco
Super. Ct. No. CGC14540429)

**ORDER CERTIFYING OPINION
FOR PUBLICATION**

**BY THE COURT:**

     The opinion filed in the above-entitled matter on October 5, 2017, was not certified for publication in the Official Reports. For good cause, the request for publication filed October 25, 2017, is granted.

     Pursuant to rule 8.1105(b) of the California Rules of Court, the opinion in the above-entitled matter is ordered certified for publication in the Official Reports.

DATE: _____       _____Acting P.J.

1

Trial Court:                                   San Francisco City and County Superior
                                               Court


Trial Judge:                                   Honorable Harold E. Kahn

Counsel:

Wylie, McBride, Platten & Renner, John McBride, Christopher E. Platten for Plaintiff
and Appellant.


Littler Mendelson, Robert G. Hulteng, Aurelio J. Pérez, Philip P. Baldwin for Defendant
and Respondent.