Filed 8/1/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CAROLYN STAATS,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>VINTNER'S GOLF CLUB, LLC,<br><br>        Defendant and Respondent. | A147928<br><br>(Napa County<br>Super. Ct. No. 26-64964) |

Plaintiff Carolyn Staats nearly died after being attacked by a swarm of yellow jackets while playing golf on a Yountville course operated by Vintner's Golf Club, LLC (Club). She sued the Club for general negligence and premises liability, but the trial court granted summary judgment against her on the basis that the Club owed no duty to protect its patrons from yellow jackets that came from an undiscovered nest on the course.

We reverse. We hold that the duty of golf course operators to maintain their property in a reasonably safe condition includes a duty to exercise reasonable care to protect patrons from nests of yellow jackets on the premises. The measures a golf course operator must take to satisfy this duty may vary, and we do not address whether the Club breached its duty, or whether any such breach caused Staats's injuries. Here, those questions involve unresolved issues of material fact that must be determined by the trier of fact in the first instance.

# I.
## FACTUAL AND PROCEDURAL
## BACKGROUND

In early July 2013, Staats was taking a golf lesson from Jeffrey Dennis, an instructor at the Club. As she prepared to take a shot on the fairway of the fifth hole, she was attacked by a swarm of yellow jackets.[1] She screamed, and Dennis tried to swat away the insects. The two then ran about 150 yards until the swarm stopped pursuing them.

Staats got into a car to be taken to the hospital and started losing consciousness. Dennis remembered there was a fire station close by, and he ran ahead to summon the paramedics outside while someone else drove Staats to the station. She was given a shot and quickly transported to a Napa hospital. A paramedic said Staats had been "within fifteen seconds" of dying.

Staats had been stung over 50 times, and she experienced "redness, welts, and swelling" all over her body. She spent the night in the intensive-care unit and missed over five weeks of work. The attack left her highly allergic to yellow jacket stings, and she now must be given three injections per month and carry multiple epinephrine pens.

At the time of the incident, the Club had no written policy on inspecting its grounds for dangerous conditions or pests. It did, however, have a pest-control company, Clark Pest Control (Clark), perform monthly inspections around the Club's restaurant and offices, primarily to discover and eradicate "roaches, insects, [and] ants." Both the Club's golf director and its grounds superintendent had seen stray yellow jackets or bees on the golf course before, but it is undisputed that before Staats was attacked the Club had no actual knowledge of any swarm, hive, or nest ever being on the grounds or of any patron ever being stung there. The Club never set traps or took other measures to control yellow jackets because it did not perceive them to be a problem.

---

[1] The term "yellow jacket" refers to "[a]ny of various North American predatory social wasps." (Oxford English Dict. Online (2018) <http://www.oed.com> [as of August 1, 2018 [yellow jacket].)

The day after the attack, the Club's business manager inspected the area of the fifth hole but did not see "any bees or yellow jackets" or locate "anything that looked like any type of hive or nest." The following day, at the manager's request, a Clark employee also conducted an inspection after Dennis pointed out where the swarm attacked Staats. The Clark employee "walked around the area looking for a nest," and "[a]fter looking for approximately fifteen minutes, [he] saw an underground hole about one and a half inches around. It was near the edge of a sand trap and had a partial lip of grass over the hole. There were about four to [five] yellow jacket/wasp[-]looking bees on the ground and about a dozen flying around." The Clark employee sprayed the underground nest and left. Yellow jacket traps were also placed near the fifth hole.

Staats filed this lawsuit in September 2014, asserting causes of action for general negligence and premises liability. The Club moved for summary judgment, claiming that it owed no duty to protect patrons from "an attack by a wild swarm of insects without . . . prior knowledge of [the swarm's] residence, congregation[,] or injury[-]producing behavior." The trial court granted the motion, finding that the Club "had no duty to protect against the risk in this case" because of the Club's "lack of knowledge" of "swarming yellow jackets or subterranean yellow jacket nests on the golf course fairway." The court entered final judgment for the Club in October 2015.

## II.
### DISCUSSION

*A. Standard of Review.*

A motion for summary judgment is properly granted if "there is no triable issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment must present evidence that either "conclusively negate[s] an element of the plaintiff's cause of action" or "show[s] that the plaintiff does not possess, and cannot reasonably obtain," evidence necessary to establish an element of the claim. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853-854.) If the defendant meets this burden, "the burden

3

shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (p)(2).)

We review the record de novo, "liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.) "We affirm the trial court's decision if it is correct on any ground the parties had an adequate opportunity to address in the trial court, regardless of the reasons the trial court gave." (*Jameson v. Pacific Gas & Electric Co.* (2017) 16 Cal.App.5th 901, 909.)

### B.     The Relevant Issue Is Whether the Club's Duty to Keep Its Premises Reasonably Safe Includes Protecting Patrons from Yellow Jacket Nests.

"The elements of a negligence claim and a premises liability claim are the same: a legal duty of care, breach of that duty, and proximate cause resulting in injury." (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1158 (*Kesner*).) Unlike the elements of breach, causation, and injury, all of which are fact-specific issues for the trier of fact, the existence and scope of a duty are questions of law. (*Id.* at pp. 1142, 1144; *Alcaraz v. Vece* (1997) 14 Cal.4th 1149, 1162, fn. 4.)

Under Civil Code section 1714, "[e]veryone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself." (Civ. Code, § 1714, subd. (a).) The statute " 'establishes the general duty of each person to exercise, in his or her activities, reasonable care for the safety of others.' " (*Kesner, supra*, 1 Cal.5th at p. 1142.) Where, as here, there is no " 'statutory provision establishing an exception to the general rule of Civil Code section 1714, courts should create one only where "clearly supported by public policy." ' " (*Id.* at p. 1143.)

4

As a consequence of this general duty, those who own or occupy property[2] have a duty to maintain their premises in a reasonably safe condition. (*Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1205 [store proprietor]; *Alcaraz v. Vece, supra*, 14 Cal.4th at p. 1156 [possessor of land]; see also *Morgan v. Fuji Country USA, Inc.* (1995) 34 Cal.App.4th 127, 134 [duty of golf course operator "to provide a reasonably safe golf course"].) To comply with this duty, a person who controls property must " ' " 'inspect [the premises] or take other proper means to ascertain their condition' " ' " and, if a dangerous condition exists that would have been discovered by the exercise of reasonable care, has a duty to give adequate warning of or remedy it. (*Salinas v. Martin* (2008) 166 Cal.App.4th 404, 412, italics omitted; see also *Ortega*, at pp. 1206-1207; *Chance v. Lawry's, Inc.* (1962) 58 Cal.2d 368, 373.)

" ' "[D]uty" is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same, to conform to the legal standard of reasonable conduct in . . . light of the apparent risk. What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty.' " (*Coffee v. McDonnell-Douglas Corp.* (1972) 8 Cal.3d 551, 559, fn. 8.) The Club does not deny that it owed Staats, a patron of its golf course, a duty to maintain its property in a reasonably safe condition. Rather, it contends that this duty "is limited when the harm at issue is caused by insects." Thus, the issue presented "is not the existence of a duty . . . as such, or the class of persons to whom the duty extends, but the nature and scope of the acknowledged duty." (*Ramirez v. Plough, Inc.* (1993) 6 Cal.4th 539, 546.)

To assess the scope of a duty, a court must "identify the specific action or actions the plaintiff claims the defendant had a duty to undertake. 'Only after the scope of the duty under consideration is defined may a court meaningfully undertake the balancing analysis of the risk and burdens present in a given case to determine whether the specific

---

[2] This opinion will variously refer to an owner or occupier of property as a property owner, a homeowner, or, as in the case of the Club, an operator of a business.

obligations should or should not be imposed.' " (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214.) Here, Staats claims that the Club had a duty to protect patrons from yellow jacket nests, including underground nests, by inspecting for them and setting traps to prevent their formation. Our analysis is therefore limited to assessing whether the Club's duty to maintain its property in a reasonably safe condition required the Club to take steps to keep the premises free of yellow jacket nests. (See *Verdugo v. Target Corp.* (2014) 59 Cal.4th 312, 336-337.)

      *C.*     *Decisions Involving Bites by Stray Insects Are Distinguishable.*

In granting summary judgment in the Club's favor, the trial court relied on two cases addressing liability for insect bites. The Club claims that these decisions are dispositive, but we disagree.

In the first decision, *Brunelle v. Signore* (1989) 215 Cal.App.3d 122 (*Brunelle*), the Fourth District Court of Appeal considered a premises liability claim against the owner of a vacation home in which the plaintiff was bitten by a brown recluse spider. (*Id.* at p. 125.) The court held that "an owner or occupier of a private residence does not have a duty to protect [against] or prevent bites from harmful insects where: (1) it is not generally known that the specific insect is indigenous to the area; (2) the homeowner has no knowledge that a specific harmful insect is prevalent in the area where [the] residence is located; (3) the homeowner has on no occasion seen the specific type of harmful insect either outside or inside [the] home; and (4) neither the homeowner nor the injured guest has seen the specific insect that bit the guest either before or after the bite occurred." (*Id.* at p. 129.) Under such circumstances, the injury was unforeseeable as a matter of law, the burden of preventing injury would be "enormous," and "the task of defining the scope of the duty and the measures required of the homeowners would be extremely difficult." (*Id.* at pp. 125, 130.)

In the second decision, *Butcher v. Gay* (1994) 29 Cal.App.4th 388 (*Butcher*), the Fifth District Court of Appeal discussed *Brunelle* in ruling that a homeowner was not liable to a guest who claimed she had contracted Lyme disease after being bitten by a tick on the homeowner's dog. (*Butcher*, at pp. 392, 401.) *Butcher* first concluded that there

was a weaker factual basis for imposing a duty on the homeowner than there was in *Brunelle* because the insect at issue, the western black-legged tick, was not readily identifiable as inherently harmful as was the brown recluse spider in *Brunelle*.  (*Butcher*, at pp. 402-403.)  Evidence showed that the western black-legged tick rarely carried Lyme disease and was not easily distinguishable from other non-carrier species of ticks.  (*Id.* at p. 403.)  *Butcher* also concluded that, even if there were a duty to protect against such insects, the guest's claim would still fail because no evidence was presented that the homeowner had any actual or constructive knowledge that any ticks carrying Lyme disease were present on the premises.  (*Id.* at p. 404.)

Shortly before oral argument in this case, the Fourth District Court of Appeal reversed a grant of summary judgment against a plaintiff who was seriously injured after being bitten by a black widow spider while eating lunch on a restaurant's patio.  (*Coyle v. Historic Mission Inn Corp.* (2018) 24 Cal.App.5th 627, 631 (*Coyle*).)  Determining that "[i]t [was] a matter of common experience and knowledge in this geographical area that black widow spiders are found inside and outside of buildings and that one must be careful to avoid being bitten by a black widow," *Coyle* held that "[r]estaurant owners have a duty to exercise reasonable care in relation to black widow spiders posing a risk of injury to patrons on the restaurant premises."  (*Id.* at pp. 636, 639.)

In so holding, the Court of Appeal declined to endorse *Brunelle*'s comment that a duty to protect against a harmful insect could not be imposed if the defendant had never seen that insect on the property.  (*Coyle, supra*, 24 Cal.App.5th at pp. 641-643; see *Brunelle, supra*, 215 Cal.App.3d at pp. 129-130.)  *Coyle* suggested that *Brunelle* relied too much on "the specific facts of [the] case when analyzing the issue of duty" and effectively "usurp[ed] the jury's role" of determining which actions the exercise of reasonable care requires.  (*Coyle*, at p. 642.)  Rather, the relevant issue is whether, "generically, not dependent on the facts of the case, . . . there [is] a duty of care," and, if so, whether "the usual standard of reasonable care [should] apply."  (*Ibid.*)  The facts of a case come into play in determining what measures are required to satisfy the standard of care.  (*Id.* at pp. 642-643; see also *id.* at p. 641 [restaurant's claim it was unaware of

spiders on its property "will be relevant when arguing the meaning of 'reasonable care' to the trier of fact"].)  Whether the measures taken by a defendant satisfied the duty of care can be determined as a matter of law when, but only when, the pertinent facts are not reasonably disputed.  (*Coyle*, at pp. 642-643 & fn. 2.)

The Club contends that *Brunelle* and *Butcher* "reached . . . equivalent outcomes based on the same fundamental principle:  a property owner owes no duty for harm caused by insects in the absence of *actual and specific* notice of the danger."  (Italics added.)  As *Coyle* makes clear, however, it is improper to determine whether a duty exists based on the specific facts of the case, which include the extent of the defendant's knowledge of the danger.  It is true that in *Coyle*, black widow spiders had previously been observed on the restaurant's property, and the Club's position is thus arguably consistent with the decision's holding, if not its reasoning.  But even if *Brunelle* and *Butcher* can be reconciled with *Coyle*, these decisions involved claims by plaintiffs bitten by individual insects whose source was unknown.  In declining to hold that, absent any knowledge such insects were present in the area, homeowners had a duty to protect guests from them, *Brunelle* and *Butcher* never discussed whether the homeowners could have discovered the risk posed by the insects through a reasonable inspection of their property or minimized the risk through preventive measures.

In contrast, the swarm of yellow jackets that attacked Staats likely came from a condition on the Club's premises, i.e., a nest.  The Club disclaims any duty by characterizing it as one to prevent "a danger that did not exist" until the moment the swarm formed and became dangerous, but Staats's claim is based on the Club's alleged failure to inspect its premises to discover and eradicate yellow jacket nests.  *Brunelle* and *Butcher* involved dangers posed by stray insects.  Their holdings are not at odds with recognizing a duty of a property owner to protect against dangers posed by discrete

conditions on the property, such as yellow jacket nests, from which dangerous insects emanate.[3]

> D.  *The Club's Duty to Keep Its Premises in a Reasonably Safe Condition Includes Protecting Patrons from Yellow Jacket Nests.*

We now turn to the central question of whether the scope of Club's duty to keep its premises in a reasonably safe condition categorically does not include protecting patrons from yellow jacket nests. In determining whether public policy supports carving out an exception to the general duty of reasonable care, "the most important factors are 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' " (*Kesner, supra*, 1 Cal.5th at p. 1143, quoting *Rowland v. Christian* (1968) 69 Cal.2d 108, 113 (*Rowland*); *Castaneda v. Olsher, supra*, 41 Cal.4th at p. 1213; *Barnes v. Black* (1999) 71 Cal.App.4th 1473, 1478.) The Supreme Court has explained that "[t]he *Rowland* factors fall into two categories. Three factors—foreseeability, certainty, and the connection between the

---

[3] Under the common law doctrine of *ferae naturae*, "a property owner owes an invitee no duty of care to protect him [or her] from wild animals indigenous to the area unless [the owner] reduces the animals to his [or her] possession, attracts the animals to the property, or knows of an unreasonable risk and neither mitigates the risk nor warns the invitee." (*Union Pac. R.R. Co. v. Nami* (Tex. 2016) 498 S.W.3d 890, 897.) The doctrine precludes strict liability for injuries caused by wild animals, although how it applies to negligence claims is less clear. (See *id.* at pp. 903-904 (dis. opn. of Johnson, J.) ["[U]nder the broad common law . . . there is not a current consensus about whether the *ferae naturae* doctrine eliminates any duty on the part of those who own or possess land to take reasonable action to warn persons on the land of, or protect them from, the risk of harm posed by wild animals or insects that might foreseeably come onto the land"].) *Brunelle* observed that the doctrine supported its holding but did not rely on it, noting that "there are no California cases which consider the issue." (*Brunelle, supra*, 215 Cal.App.3d at p. 129, fn. 5.) Neither party addresses the applicability of the doctrine here, and we conclude that it does not immunize the Club from liability.

plaintiff and the defendant—address the foreseeability of the relevant injury, while the other four—moral blame, preventing future harm, burden, and availability of insurance—take into account public policy concerns that might support excluding certain kinds of plaintiffs or injuries from relief." (*Kesner*, at p. 1145.)

1.　　Foreseeability factors.

As we have mentioned, the existence and scope of a duty are questions of law, while breach, causation, and injury are fact-specific issues for the trier of fact. (*Kesner, supra*, 1 Cal.5th at p. 1142.) As a consequence, the analysis of foreseeability for purposes of assessing the existence or scope of a duty is different, and more general, than it is for assessing whether any such duty was breached or whether a breach caused a plaintiff's injuries. "[I]n analyzing duty, the court's task ' " 'is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the *category* of negligent conduct at issue is sufficiently likely to result in the *kind* of harm experienced that liability may appropriately be imposed on the negligent party.' " ' " (*Laabs v. Southern California Edison Co.* (2009) 175 Cal.App.4th 1260, 1272-1273 (*Laabs*), some italics added.) "The jury, by contrast, considers 'foreseeability' in two more focused, fact-specific settings. First, the jury may consider the likelihood or foreseeability of injury in determining whether, in fact, the particular defendant's conduct was negligent in the first place. Second, foreseeability may be relevant to the jury's determination of whether the defendant's negligence was a proximate or legal cause of the plaintiff's injury." (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 573, fn. 6.)

Staats argues that the relevant question here, "framed at the proper level of generality, is whether it is foreseeable that someone playing golf . . . might be attacked by a swarm of venomous stinging insects which have nested on the golf course in an area from which golfers will foreseeably play." The Club frames the relevant question similarly, arguing that the issue is whether it is "foreseeable that an unknown, underground nest of yellow jackets might become agitated, form a swarm, and attack a patron." Under both formulations, the focus is not on whether the Club knew or should

10

have known about the particular yellow jacket nest at issue or whether it was foreseeable that Staats would be attacked by a swarm emanating from it. Rather, the focus is on the more general question of whether it is foreseeable that a yellow jacket nest on the grounds might pose a danger to patrons.

"Foreseeability supports a duty only to the extent the foreseeability is reasonable." (*Sturgeon v. Curnutt* (1994) 29 Cal.App.4th 301, 306.) When determining whether a particular category of harm is reasonably foreseeable, " 'it is well to remember that "foreseeability is not to be measured by what is more probable than not, but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct." [Citation.] One may be held accountable for creating even " 'the risk of a slight possibility of injury if a reasonably prudent [person] would not do so.' " ' " (*Laabs, supra*, 175 Cal.App.4th at p. 1272, quoting *Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 57.)

The evidence presented here supports the conclusion that it was reasonably foreseeable that yellow jackets in an underground nest on the premises would form a swarm and attack a nearby golfer. In opposing the Club's motion for summary judgment, Staats submitted the declaration of Lynn Kimsey, Ph.D., an entomologist at the University of California, Davis. Dr. Kimsey averred that "[y]ellow jackets are prevalent throughout Northern California, including [in the] Napa Valley." "Abandoned gopher holes, ground squirrel holes[,] and rabbit burrows are favored areas for [yellow jacket] nests," and "[i]t is eminently foreseeable" that yellow jackets will form nests in such locations on a golf course. Dr. Kimsey also stated that "[y]ellow jackets aggressively protect their nest if they feel it is threatened" and that "[t]he only time yellow jackets behave [en masse]" as they did to attack Staats "is very near the nest entrance, to protect it, usually within ten feet or so of the entrance to the nest." Staats also submitted the declaration of a provider of pest control services who had treated underground yellow jacket nests at other golf courses in Northern California, including one in Napa Valley. Finally, Club employees acknowledged they had previously seen yellow jackets on the course.

11

The Club claims that the danger was not foreseeable because no danger existed "until the underground nest became agitated and produced a swarm of yellow jackets." But the question is whether it is reasonably foreseeable that a nest of yellow jackets—i.e., a condition existing on the premises—might produce a swarm that would attack a patron. Contrary to the Club's position, a danger does not have to "previously manifest" to be foreseeable. " ' "[T]he mere fact that a particular kind of an accident has not happened before does not . . . show that such accident is one which might not reasonably have been anticipated." [Citation.] Thus, the fortuitous absence of prior injury does not justify relieving [a] defendant from responsibility for the foreseeable consequences of its acts.' " (*Lawrence v. La Jolla Beach & Tennis Club, Inc.* (2014) 231 Cal.App.4th 11, 31.) In any event, because we must assess whether the presence of nests on a golf course creates a general risk of foreseeable injury—i.e., the possibility that yellow jackets will swarm and attack a golfer—we find it of marginal importance that the Club claims it was unaware of any previous swarm or sting. (See *Laabs, supra*, 175 Cal.App.4th at p. 1273 [where defendant "sought summary judgment solely on the ground that it 'owed no duty' as a matter of law," court "not concerned with . . . 'more focused, fact-specific' inquiries" involving defendant's conduct in particular].)

Moreover, Staats presented evidence that the Club, like the defendant in *Coyle* and unlike the defendants in *Brunelle* and *Butcher*, was aware that yellow jackets could be found in the area, and specifically on the golf course. The Club says it could not anticipate the level of danger without consulting with "a trained expert to determine when, how, and where a yellow jacket swarm might form and launch an attack." But it is common knowledge that yellow jackets live in nests and are dangerous in large numbers, and people generally avoid these nests for fear of being stung. Even without knowing the specific reasons why swarms form, reasonable people can foresee that a yellow jacket nest could cause injuries.

The other two factors related to foreseeability of the injury also weigh in favor of finding a duty. "The second *Rowland* factor, the degree of certainty that the plaintiff suffered injury, 'has been noted primarily, if not exclusively, when the only claimed

12

injury is an intangible harm such as emotional distress' " or where there are "concerns about the existence of a remedy." (*Kesner, supra*, 1 Cal.5th at p. 1148.) Here, there is no dispute that Staats suffered an injury that is "certain and compensable under the law." (*Ibid.*) "The third *Rowland* factor, ' "the closeness of the connection between the defendant's conduct and the injury suffered[,]" [citation] is strongly related to the question of foreseeability itself' " and generally is relevant when intervening third party conduct caused the injury. (*Ibid.*) Here, to the extent the forming of a yellow jacket swarm can be analogized to such conduct, we have already discussed why it is reasonably foreseeable that a nest of yellow jackets might cause injury to golfers.

### 2. Policy factors.

Having concluded that it is reasonably foreseeable that a yellow jacket nest on a golf course could cause injury, we turn to weigh the " ' " 'policy considerations for and against the imposition of liability.' " ' " (*Kesner, supra*, 1 Cal.5th at pp. 1149-1150.) We start by addressing the main policy factor the parties discuss, the burden on a golf course operator to comply with the duty of ordinary care in this context. (See *Kesner, supra*, 1 Cal.5th at p. 1152; see also *Lawrence v. La Jolla Beach & Tennis Club, Inc., supra*, 231 Cal.App.4th at pp. 23-24 ["primary considerations" when scope of duty is at issue "are the foreseeability of the harm and the burden on the defendant of protecting against the harm"].) The Club contends that a duty to protect its patrons from yellow jacket nests would impose an "immense burden of inspecting its entire outdoor property—including every hole, crevice, tree, shrub, etc.—for every conceivable danger that might someday come into being under precise circumstances. It is difficult to imagine the limits of such a duty—it would extent to every type of insect, rodent, bird, and other natural creature that could someday resort to its base instinct and harm a patron." We are not convinced.

To begin with, the issue here is whether a golf course operator has a duty to protect its patrons from the risk posed by yellow jackets nests, which are a condition on the premises, not whether it has a duty to protect against harm caused by wild animals more broadly. The existence of a duty to protect against the risk of other animals or

13

insects will depend on a variety of factors, such as whether the animals or insects are inherently dangerous and whether their source is a condition on the premises.

In addition, the duty of a golf course operator to protect patrons from yellow jacket nests does not necessarily require the operator to inspect the "entire outdoor property," much less "every hole, crevice, tree, [or] shrub." As we have mentioned, the measures an operator must take to comply with the duty to keep the premises in a reasonably safe condition depend on the circumstances, and the issue is a question for the jury unless the facts of the case are not reasonably in dispute. (See *Kesner, supra*, 1 Cal.5th at p. 1144; *Isaacs v. Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 131; *Coyle, supra*, 24 Cal.App.5th at pp. 640, 642-643 & fn. 2.)

The Club points to the declarations of its business manager and its grounds superintendent to support its claim that it would have to hire an additional employee to comply with the proposed duty. Both men stated that "[r]outine inspection of each and every hole, pipe, culvert, tree, depression and crevice on the course would require hiring" at least one additional ground crew member "whose sole job would be to inspect for flying insect nests [and] hives." The business manager further averred that the costs of hiring one or more additional employees to perform such inspections "would be overwhelming and would threaten if not make [impossible] continued operation." But evidence addressing the economic burden of inspecting every conceivable place a nest might form is unhelpful in assessing the burden of finding a duty to exercise *reasonable* care in keeping golf course patrons safe.

Staats maintains that the risk of yellow jacket attacks can be significantly mitigated through setting traps, and she accurately observes that the Club has not shown "that retaining a pest control service to regularly inspect for and treat insect nests is somehow prohibitively expensive for a golf course." She points to the declaration of the pest control services provider, in which he stated that for several years he provided pest control services for a resort in the Napa Valley whose property included a golf course. Because the resort "did not like yellow jackets flying around," he "instituted a program to stop the nests at early stages" by setting up "bait stations with a mixture of hamburger

14

and pesticides. The yellow jackets would take the hamburger back to the underground nests and feed it to the larvae. This would poison them and prevent the proliferation of more yellow jackets." He had also treated several nests discovered at the resort and at other golf courses in the Bay Area, including those discovered "by grounds[]keeper personnel who saw them while mowing the lawn in the fairways."

The Club does not claim that retaining a pest control service to eradicate existing yellow jacket nests would be particularly costly, and as we have said, its evidence about the cost of inspections addresses only the unreasonable scenario under which it would have to meticulously comb through the entire premises looking for hidden nests. The Club also maintains that the claim its existing personnel "could simply install traps" is "devoid of merit" because "[t]here is no evidence in the record that installation of traps would eradicate entire nests, as opposed to isolated yellow jackets." While it may be true that traps would not remove the danger posed by existing nests, there is evidence that traps would prevent the formation of new nests, significantly reducing the risk to patrons. In sum, there is no basis in the record for us to conclude that a duty to exercise reasonable care in protecting patrons from yellow jacket nests would impose a heavy burden on golf course operators.

The remaining policy-related *Rowland* factors do not weigh in favor of carving out an exception to the duty of golf course operators to keep their premises reasonably safe. Most importantly, the policy of preventing future harm supports imposing the cost of injuries on the operators. "In general, internalizing the cost of injuries caused by a particular behavior will induce changes in that behavior to make it safer." (*Kesner, supra*, 1 Cal.5th at p. 1150.) The Club does not dispute that protecting people from serious injury or even death is an important policy, and it does not point to any " 'laws or mores indicating approval of the conduct or . . . undesirable consequences of allowing potential liability' " in relation to the community's interest. (*Ibid.*) Relatedly, the factor of moral blame weighs against creating an exception for yellow jacket nests because golf course operators are in a better position to protect against the risk posed by nests on their premises than golfers are. (See *id.* at p. 1151 [appropriate to assign moral blame "where

15

the defendants exercised greater control over the risks at issue"].) And although there is no evidence in the record about the availability or cost of insuring against the risk, we find it hard to believe that golf courses would have excessive difficulty procuring insurance coverage to cover injuries to their patrons from yellow jacket attacks. (See *Coyle, supra*, 24 Cal.App.5th at p. 638.)

Finally, the Club contends that we should hesitate to "impos[e] a legal duty that a landowner must find and kill animals found on its natural property," because "the law recognizes that animals are 'living creatures' and must be treated as such." We recognize that the type of animal at issue may affect the policy considerations in weighing whether there is a duty to protect against the risk the animal poses. For example, the Legislature has enacted laws to protect bees because bees are important to the state's welfare. (Food & Agr. Code, §§ 29000, 29100, subd. (a); see generally *id.*, § 29000 et seq.) If an animal was endangered, or risked becoming endangered, that might also weigh against a duty that would in practice require killing the animal. The Club points to no law or other circumstance, however, suggesting yellow jackets need special protection. We agree with Staats that in this instance, the policy of protecting human life outweighs the policy of protecting animal life.

Having concluded that the Club had a duty to protect Staats from the risk posed by yellow jacket nests on its property, we perceive no other basis on which to affirm the grant of summary judgment. We agree with Staats that triable issues of material fact exist as to the other elements of her negligence claims, and the Club does not argue otherwise. In particular, which actions the Club should have taken to minimize the risk (including the extent of reasonable inspections), whether the Club did take those actions, and whether any failure to do so proximately caused Staats's injuries are all questions for the trier of fact. We hold only that golf course operators are not exempted from exercising reasonable care to protect their patrons against the foreseeable risk posed by yellow jacket nests on their premises.

16

## III.
### DISPOSITION

The judgment is reversed, and the case is remanded for further proceedings consistent with this opinion. Appellant is awarded her costs on appeal.

_____

Humes, P.J.


I concur:



_____

Dondero, J.












*Staats v. Vintner's Golf Club, LLC*  A147928


18

**CONCURRENCE OF JUSTICE BANKE**

I concur in the judgment. Given the uncontroverted record that the golf course in question is in an area where yellow jackets are endemic, there seems no question that, under established case law, the owner's duty of care, as to at least the area of play, includes taking reasonable measures to protect against the formation of yellow jacket nests and to eradicate nests revealed by reasonable inspection of the property.

I write separately to observe that as the courts renew their focus on a "broad level of factual generality" in evaluating duty (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 772; accord *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1144–1143), we must remain mindful that facts can be articulated at such a heightened level of generality as to enter the realm of boundless foreseeability, which the duty analysis is intended to foreclose (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 397).[1] So, too, as the courts recognize that the facts of a "particular case" generally pertain to breach and causation, rather than to duty (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 629–630; *Kesner*, at p. 1144), we should anticipate that there will be cases where a fully developed record reveals that no reasonable finder of fact could

---

[1] In some contexts, the courts have continued to focus on particularized facts in determining whether a duty of due care is owed—for example, in connection with the criminal conduct of third parties in the absence of a "special relationship" (e.g., *Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1213–1214; *Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1145–1151; *Smith v. Freund* (2011) 192 Cal.App.4th 466, 472–476; *Melton v. Boustred* (2010) 183 Cal.App.4th 521, 536–539; *J.L. v. Children's Institute, Inc.* (2009) 177 Cal.App.4th 388, 396–399; *Rinehart v. Boys & Girls Club of Chula Vista* (2005) 133 Cal.App.4th 419, 430–435) and for injuries caused by a dog owned by someone other than the defendant (e.g., *Chee v. Amanda Goldt Property Management* (2006) 143 Cal.App.4th 1360, 1369–1372; *Martinez v. Bank of America* (2000) 82 Cal.App.4th 883, 890–892). Notably, in *Castaneda*, Justice Kennard both dissented and concurred. In her view, the majority improperly focused on particular facts of the case and confused the issue of duty with that of breach. (*Castaneda*, at pp. 1225–1229 (conc. & dis. opn. of Kennard, J.).) However, for policy reasons, Justice Kennard joined in holding that the owner of a mobile home park owed no duty to refuse to rent space to a suspected gang member. (*Id.* at pp. 1229–1230 (conc. & dis. opn. of Kennard, J.).)

1

conclude there was a breach of the duty of due care or that any breach thereof was the cause of the claimed injury, and summary judgment would be properly granted. (E.g., *Peralta v. The Vons Companies, Inc.* (2018) 24 Cal.App.5th 1030, 1034–1037; see *Luna v. Vela* (2008) 169 Cal.App.4th 102, 114 [observing that reversal on assumption of risk and duty issues would not preclude summary judgment on fully developed record based on no breach or causation]; *Smith v. St. Jude Medical, Inc.* (2013) 217 Cal.App.4th 313, 322–323; *Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 764–765; cf. *Regents of University of California*, at p. 634 [emphasizing "that a duty of care is not the equivalent of liability," "[r]easonable care will vary under the circumstances of the case," and the "[c]ourts and juries should be cautioned to avoid judging liability based on hindsight"].)

_____

Banke, J.

A147928, *Staats v. Vintner's Golf Club*

Trial Court:

Napa County Superior Court


Trial Judge:

Hon. Diane M. Price


Counsel for Plaintiff and Appellant:

Bruce L. Ahnfeldt, Law Office of Bruce L. Ahnfeldt

Frederick H. Brennan, Law Office of Bruce L. Ahnfeldt


Counsel for Defendant and Respondent:

Gregory P. Arakawa, Wood, Smith, Henning & Berman LLP

Steven R. Disharoon, Wood, Smith, Henning & Berman LLP


*Staats v. Vintner's Golf Club, LLC*  A147928